IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Greensboro Division

| | | |
|---|---|---|
| THERESA SCHMITZ, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 1:18-cv-910 |
| | ) | |
| ALAMANCE-BURLINGTON BOARD | ) | |
| OF EDUCATION d/b/a ALAMANCE- | ) | |
| BURLINGTON SCHOOL SYSTEM, | ) | |
| | ) | |
| Defendant | ) | |

**PLAINTIFF'S MEMORAMDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

The Complaint alleges that Defendant's Principal embarked on a course of

retaliation against the Plaintiff teacher after she complained that he was treating her

vastly different than he treated other employees because she had requested minor

temporary schedule adjustments so she could care for her minor son (who had just been

diagnosed with Recklinghausen's Disease and required surgery to remove a brain tumor

and chemotherapy), and then further retaliated against Plaintiff after she consulted the

Human Resources Department about the retaliation. The Principal ultimately ended

Plaintiff's employment by providing her with the Hobson's choice of (1) immediately

signing a pre-drafted letter of resignation or (2) being placed on a "list of… terminated

employees who were not eligible for hire within the State's public school system, thereby

jeopardizing her entire career choice." [Compl., ¶ 23]. Because the Complaint clearly

alleges that the course of conduct leading up to the resignation – including the presentation of the letter itself – is discriminatory and retaliatory, the Complaint adequately sets forth viable causes of action in all three of its counts. As such, Defendant's Motion to Dismiss should be denied in full.

## STATEMENT OF THE CASE

Plaintiff Theresa Schmitz filed the Complaint in Superior Court on October 5, 2018 [D.E. 5]. Defendant Board removed the action to this court on October 30, 2018 [D.E. 1]. After receiving an extension of time [D.E. 6], Defendant moved to dismiss under Fed. R. Civ. Pro. 12(b)(6) [D.E. 8]. After receiving an extension of time [D.E. 12], Plaintiff now submits this Memorandum of Law in Opposition to the Motion to Dismiss.

## STATEMENT OF FACTS

In late October 2016, Defendant Alamance-Burlington School System ("Defendant ABSS") hired Plaintiff Theresa Schmitz as a fourth-grade teacher at the Sylvan Elementary School. Compl. ¶ 6. Plaintiff performed satisfactorily through the first months of her employment and received positive feedback. Compl. ¶ 7.

In November 2016, Plaintiff's minor son was diagnosed with a brain tumor and required emergency brain surgery on November 23, 2016. He was released from the hospital on November 28, 2016, and Plaintiff returned to work on November 29, 2016. Compl. ¶ 8. Plaintiff's son was further diagnosed with NF1 (neurofibromatosis Type 1), also known as von Recklinghausen's Disease, is a rare genetic disorder causing benign growths in various parts of the body, including the brain and optic nerves. In addition to

2

the brain tumor, Plaintiff's son developed optic gliomas on his optic nerves, and he suffered speech delays and continuing language challenges, processing skills deficits, and learning challenges as a result of the disease. He has been diagnosed with developmental disability due to NF1. His condition affects several major life functions including but not limited to seeing, thinking, and learning, and after his surgery he was unable to walk or care for himself, and he has required regular MRIs and chemotherapy as a result of the disease. Compl. ¶ 9. As such, Plaintiff's minor son suffers from a disability and has a record of a disability. Compl., ¶ 10.

From November 29 to December 5, 2016, Plaintiff requested and was approved to leave school 45 minutes early, at 2:30pm, so she could care for her son at home while her spouse reported for work. Classes ended at 2:30pm, but the official end of the teacher school day was 3:15pm. Her principal, Mark Gould granted permission for her to leave work early that week. Compl., ¶ 12.

After that first week, however, Principal Gould's attitude and treatment toward Plaintiff changed dramatically. On December 5, 2016, Plaintiff took her son his doctor to have stitches from the surgery removed. At that time, the physician told Plaintiff that her son would be incapacitated for some time and could not return to school for several weeks. Compl. ¶ 12. Plaintiff emailed Principal Gould and explained the situation and requested to leave early at 2:30pm for one more week. Compl., ¶ 13. Principal Gould failed to reply at all Plaintiff's request. When she received no response, she called and left a message on Principal Gould's cell-phone voice mail. Principal Gould eventually

3

responded electronically and explained that he could not talk because he was at a child's basketball game, but that they would discuss it tomorrow. *Id.*

The next day, however, Principal Gould continued his "cold-shoulder treatment." He did not email or text her; he did not call; he did not send a note; and he did not try to meet with Plaintiff. When the end of the day arrived with no communication from Principal Gould, Plaintiff reasonably inferred it was okay to leave early as she had the previous week. Compl. ¶ 14. She therefore left to attend to her child's needs.

Later that day, however, Plaintiff received an email from Principal Gould stating that he had not seen her at the very end of the day on bus duty, and inquiring where she had been. *Id.* Plaintiff emailed him back immediately and explained that she had taken his lack of communication as a tacit approval of her request to leave early. Again, Principal Gould failed to respond in any fashion. With this, Plaintiff became worried and anxious. She felt she needed guidance before she interacted further with Principal Gould. She advised Principal Gould that she would not be at work the following day. *Id.*

The next day Plaintiff contacted Defendant's human resources ("HR") department and explained her situation with her son and the need to care for him. She told them she thought Principal Gould was bullying her and retaliating against her for caring for her disabled son who had been diagnosed with a genetic condition. Compl. ¶ 15. Later that same day, Defendant HR department informed her that her leaving at 2:30pm on a short-term basis – which had been okay the week before – would no longer be permitted. They told her that instead, she had to take her leave in half-days, and she would only be paid

4

for the half-days she worked. Plaintiff asked why she could not leave at 2:30pm as she had the week before and have per pay docked accordingly, and neither the HR department nor Principal Gould offered any explanation. Compl. ¶ 16. Other employees, however, were regularly permitted to take sick leave in less-than-half-day increments on temporary bases, and they were not retaliated against for talking leave or because of anticipated future leave requirements. Compl. ¶ 30.

Plaintiff therefore worked only half days until the holiday break through December 16, 2016, at which time she returned to her regular work schedule. After the holiday break, Plaintiff did not take – nor request – any more half days to care for her disabled son. *Id.* at ¶¶ 16-17.

Despite Plaintiff's return to a regular work schedule, immediately after her complaint that Principal Gould was bullying her on account of her requests for leave to care for her disabled son, Principal Gould began a course of retaliation directed at Plaintiff. He began nitpicking Plaintiff and holding her to a much higher standard than the other teachers at the school. He changed her schedule and responsibilities. She was scolded for viewing a work-related email (although Principal Gould made it sound like it was personal email), using the restroom, and sending children to the principal's office for behavior concerns (which is the correct protocol). Compl. ¶¶ 18, 30.

Plaintiff again complained to HR and explicitly stated she felt she was being bullied and retaliated against because of her association with her disabled child. Compl. ¶ 19. At that point, in further retaliation, Principal Gould placed Plaintiff on a

Performance Improvement Plan (PIP) on March 14, 2017.  The PIP misstated facts and held Plaintiff to a much higher standard than other teachers.[1]  The PIP entailed much busy-work not required of other teachers.  Plaintiff successfully addressed all issues raised in the PIP.  Compl., ¶¶ 20-21.

During this time period, Plaintiff was performing satisfactorily.  Principal Gould would later write that Plaintiff:

….has very capably taught math, reading, social studies, and science.

Ms. Schmitz is to be commended for her professionalism, concern for her students, and quality of instruction. She plans well and works diligently at being organized. Her preparation each day is thorough and the results, evident.  Her assignments and assessments are well-conceived, quickly corrected, and promptly returned. I have found Ms. Schmitz to be uniquely resourceful and adaptive.

Student respect is obvious in her classroom. She deeply cares about her students and they look to her for approval and guidance.  Her approach to teaching has generated a warm and close rapport with her classes as well as our faculty.

Ms. Schmitz has the skills to be an outstanding teacher…

Compl. ¶ 22.

Despite these glowing assessments of Plaintiff's teaching skills, on or about May 12, 2017, Plaintiff was called into a meeting with HR and Principal Gould and handed a pre-drafted "letter of resignation" for her to sign, effective at the end of the school year.

---

[1] Defendant asserts that "Plaintiff does not allege that the PIP was unwarranted, or that its feedback was inaccurate." [D.E. 9, pp. 3-4].  This is simply incorrect.  Plaintiff alleges the PIP was inaccurate and held Plaintiff to standards above and beyond what was expected of other teachers.  Plaintiff alleges she was performing satisfactorily and, indeed, Principal Gould himself later wrote glowingly of her performance during the same time period.  Although the term "unwarranted" may not be used in the Complaint, it is unmistakably represented that the PIP was unjustified and unwarranted.

Plaintiff was told that if she did not sign and turn in the resignation letter, she would be "put on a list she did not want to be on," presumably a list of terminated employees or employees who were not eligible for hire within the State's public school systems, thereby jeopardizing her entire career choice. Compl. ¶ 23.

Plaintiff's forced resignation was a constructive discharge of her employment. Compl. ¶ 30. The adverse employment actions occurred on account of her protected activities, as evidenced by in part, by (1) the temporal proximity of the events, (2) the negative citation of her leave to care for her disabled son, (3) the Principal's negative animus displayed to her disability-related requests, and (4) the request for her to resign when she was performing satisfactorily. Compl., ¶ 36. Plaintiff suffered substantial injury on account of Defendant's disparate treatment and retaliation, including loss of pay and benefits, and mental anguish.

## ARGUMENT

### I.    STANDARD OF REVIEW.

For purposes of a motion to dismiss, "(1) the complaint is construed in the light most favorable to the plaintiff, (2) its allegations are taken as true, and (3) all reasonable inferences that can be drawn from the pleading are drawn in favor of the pleader." § 1357 *Motions to Dismiss—Practice Under Rule 12(b)(6)*, 5B FED. PRAC. & PROC. CIV. § 1357 (3d ed.) (citations omitted).

Further, "[a] complaint should not be thus dismissed merely because the court doubts that the plaintiff will ultimately prevail; so long as a plaintiff colorably states facts

7

which, if proven, would entitle him to relief, the motion to dismiss should not be granted." *Adams v. Bain*, 697 F.2d 1213 (4th Cir. 1982) (citations omitted).

The Supreme Court has held that "an employment discrimination plaintiff need not plead a prima facie case of discrimination . . . to survive [a] motion to dismiss," because "[t]he prima facie case . . . is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510, 515 (2002). Instead, that "the ordinary rules for assessing the sufficiency of a complaint apply." *Id.* Under those rules, a plaintiff fails when the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Woods v. City of Greensboro*, 885 F.3d 639 (4th Cir. 2017). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Thus, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. 544, 555, 570 (2007).

"'Plausibility' in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not. … In other words the court will ask itself could these things have happened, not did they happen." § 1357 *Motions to Dismiss—Practice Under Rule 12(b)(6)*, 5B FED. PRAC. & PROC. CIV. § 1357 (3d ed.) (citing *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)).

A court does not accept conclusory allegations as true, but a party's intent or discriminatory animus may be alleged generally. *Cordova v. Vaughn Mun. Sch. Dist. Bd. of Educ.*, 3 F.Supp.2d 1216 (D.N.M. 1998).

## II.   RETALIATORY CONDUCT, INCLUDING PLACEMENT ON "PIP" PLAN AND DEMAND TO SUBMIT RESIGNATION LETTER, CLEARLY CONSTITUTES "ADVERSE EMPLOYMENT ACTION."

The Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, protects not only those employees with disabilities, but also prohibits employees from taking adverse employment action "because of the known disability of an individual with whom the qualified individual is known to have a relationship or an association." 42 U.S.C. § 12112(b)(4).

"Under the burden-shifting framework, the plaintiff must first establish a *prima facie* case of retaliation by showing: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 327 (4th Cir. 2018). On pp. 7-10 of Defendant's brief [D.E. 9], Defendant contends that Plaintiff failed to satisfy element 2, claiming Plaintiff failed to allege that she suffered any adverse action.

"An adverse employment action is a discriminatory act which adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375–76 (4th Cir. 2004) (citing *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001)) (internal quotations omitted). "Further, where an

9

employee resigns, the resignation may nonetheless amount to a constructive discharge, and thus meet the adverse employment action element, where the resignation is deemed to be coerced or involuntary." *Id.*

Importantly, Plaintiff reports that her supervisor was "bullying and retaliating against her" in a continuing and mounting course of disparate treatment after she reported his retaliation. She was scolded for viewing a work-related email (although Principal Gould made it sound like it was personal email), using the restroom, and sending children to the principal's office for behavior concerns (which is the correct protocol). Compl. ¶ 18. This led to the issuance of a bogus PIP plan, containing misstated facts and holding Plaintiff to standards not required of other employees, jeopardizing her continued employment. Placement of an employee on a bogus PIP plan is recognized as an adverse employment action. "[T]here is no authority in the Fourth Circuit that holds that a PIP cannot be a materially adverse action." *Emami v. Bolden*, 241 F. Supp. 3d 673, 685 (E.D. Va. 2017) (court finds retaliatory placement on PIP, putting employment at jeopardy, constituted materially adverse action).

Here it is important to note that Plaintiff alleges she was performing satisfactorily and that the PIP was "bogus." That is, it misstated facts and tried to fabricate innocent conduct – like using the restroom as other teachers did or attending to a work email – into performance deficiencies. Plaintiff's allegations are distinguishable from those cases where a PIP was justified. Apparently acknowledging that such facts distinguish Plaintiff's case from those cited in Defendant's brief, Defendant erroneously represents

that "Plaintiff does not allege that the PIP was unwarranted—she does not claim that she was performing satisfactorily at that time, nor does she claim that the (unnamed) provisions of the PIP were unnecessary." [D.E. 9 at pp. 9-10]. That claim is untenable, though, as Plaintiff asserts her placement on the PIP was done in retaliation, and also that it misstated facts and held plaintiff to a much higher standard that other employees (Compl. ¶ 20), all the while why she was performing satisfactorily. Compl. ¶ 22. Thus, Plaintiff's placement in a bogus PIP plan was unwarranted, jeopardized her continued employment, subjected her to substantially more work than her peers, and was used to later justify her termination, and as such, it constituted an adverse employment action.

It is of course universally recognized that a termination constitutes an "adverse employment action." Moreover, "constructive discharge" is treated as a termination under federal discrimination law. "An employee can establish a claim for constructive discharge when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns." *Shepherd v. Gannondale*, No. 14 Civ. 8, 2014 WL 7338714, at *15 (W.D. Pa. Dec. 22, 2014). In the constructive discharge context, "[t]he resignation is treated as if it were an outright dismissal by the employer, which can serve as the basis for a discrimination claim." *Hibbard v. Penn–Trafford Sch. Dist.*, No. 13 Civ. 622, 2014 WL 640253, at *7 (W.D. Pa. Feb. 19, 2014) (citing *Duffy v. Paper Magic Group, Inc*., 265 F.3d 163, 167–68 (3d Cir.2001)).

> "[S]ince it is clear that plaintiff was presented with
> the Hobson's choice of termination or resignation, the Court finds that

plaintiff was subjected to an adverse employment action sufficient to meet the requirement of the third element of the *McDonnell Douglas prima facie* case.

*Hill v. St. Louis Univ*., 923 F. Supp. 1199, 1210 (E.D. Mo. 1996), *aff'd*, 123 F.3d 1114 (8th Cir. 1997). *See also Hudock v. Kent Cty. Bd. Of Educ.*, 2015 WL 1198712 at *16 (D. Md. Mar. 16, 2015) ("Where, as here, an employee is asked to choose between "immediate resignation or immediate termination," he is faced with "no genuine choice or alternative at all; it is rather a variant of the proverbial Hobson's choice where the so-called 'choice' is wholly illusory and is in fact no choice at all.") (citing *Bauer v. Holder*, 25 F. Supp.3d 842, 852-53 (E.D. Va. 2014).

In *Stone v. University of Md. Med. Sys. Corp*.¸855 F.2d 167 (4th Cir. 1988), the Fourth Circuit recognized that a forced resignation can constitute a constructive discharge and hence an adverse employment action. There, the court observed that "particular "resignations have been found involuntary, hence, per our analysis, "deprivations" of property, in two circumstances: (1) where obtained by the employer's misrepresentation or deception…and (2) where forced by the employer's duress or coercion." *Id.* at 174 (citations omitted).

Under the "misrepresentation" theory, a resignation may be found involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation. *See Scharf v. Department of Air Force,* 710 F.2d 1572, 1575 (Fed. Cir. 1983). A misrepresentation is material if it concerns either the consequences of the resignation, *see id.* (effect on accumulated sick leave) or the

12

alternative to resignation, *see Covington v. Department of Health & Human Servs.,* 750 F.2d 937, 942 (omission to explain right to be reassigned if resignation declined). The reliance must be reasonable under the circumstances. *Scharf,* 710 F.2d at 1575.

Under the "duress/coercion" theory, a resignation may be found involuntary if on the totality of circumstances it appears that the employer's conduct in requesting resignation effectively deprived the employee of free choice in the matter. *Stone* at 174. "Factors to be considered are (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation." *Id.*

Here, Plaintiff was presented with the option of immediately signing the pre-drafted resignation letter, or being "put on a list she did not want to be on," presumably a list of terminated employees or employees who were not eligible for hire within the State's public-school systems, thereby jeopardizing her entire career choice. Compl. ¶ 23. The statement concerns the consequences of not accepting the resignation, and implies she will be terminated and then put on a list of employees not hirable as teachers within the state. If it was false, it would constitute an obvious misrepresentation about a material matter, and it is reasonable that Plaintiff would accept resignation instead of give up her teaching career. That is, if Defendant's statement was false, it clearly constitutes a misrepresentation sufficiently material to render the resignation involuntary.

Case 1:18-cv-00910-WO-LPA   Document 13   Filed 01/14/19   Page 13 of 25

If the statement was true, Defendant fares no better. Here, Plaintiff was presented with a pre-drafted letter of resignation spelling out all the terms and conditions of her resignation. She was given no other alternative, and not permitted to choose her termination date or other terms of her resignation, nor even what "she would say" in her own termination letter. As in *Bauer*, "the totality of the circumstances makes unmistakably clear that plaintiff lacked free choice in his resignation…Accordingly, plaintiff's resignation was involuntary and thus amounts to a constructive discharge." *Bauer* at 852-853 (noting "choice" to resign is wholly illusory where plaintiff presented choice of termination or resigning on terms spelled out in employer-provided template resignation letter he had to sign).[2]

Here, Plaintiff alleges that although she was performing satisfactorily at the time, Defendant called her into a meeting and handed her a pre-drafted "letter of resignation" for her to sign, effective at the end of the school year. Plaintiff was told that if she did not sign and turn in the resignation letter, she would be "put on a list she did not want to be on." Compl. ¶ 23. Plaintiff alleges she was presented with the "forced resignation letter," thereby constructively terminated her employment. Compl. ¶ 24.[3] These

---

[2] Defendant claims that the failure to specifically spell out and enumerate all of the facts supporting the various factors weighed in the presentation of its defense is fatal to Plaintiff's claim. [D.E. 9 at p. 13]. Plaintiff has set forth, however, sufficient allegations to reasonably infer all required elements. It is not necessary at the pleading stage to incorporate every fact necessary to effectively combat every possible defense a defendant might raise.

[3] In assessing whether or not Plaintiff states sufficient facts to establish a "constructive discharge" [D.E. 9, pp. 15-17], Defendant ignores the presentation of the resignation letter with Defendant's demand that Plaintiff sign the letter and accept its terms, or be banished from teaching in public schools in North Carolina. These actions were obviously intended to secure Plaintiff's "quit" or resignation, and any reasonable person would have felt compelled to resign under similar circumstances. Further, Plaintiff alleges that she suffered "changes to her schedule and responsibilities," Compl., ¶ 30, although Defendant contends that Plaintiff failed to make such allegations [D.E. 9, p. 16].

14

allegations, coupled with those of the disparate treatment, nit-picking, and the bogus PIP,

sufficiently set forth adverse employment actions to survive a Rule 12(b)(6) motion.

## III. COMPLAINT ADEQUATELY ALLEGES ASSOCIATIONAL DISCRIMINATION UNDER ADA.

29 C.F.R. § 1630.8 states that: "It is unlawful for a covered entity to exclude or

deny equal jobs or benefits to, or otherwise discriminate against, a qualified individual

because of the known disability of an individual with whom the qualified individual is

known to have a family, business, social or other relationship or association."

The Fourth Circuit Court of Appeals recognized "associational discrimination"

under the ADA in *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209 (4th Cir. 1994). There,

the Court observed that:

> The ADA prohibits employers from taking adverse employment action
> "because of the known disability of an individual with whom the qualified
> individual is known to have a relationship or association." 42 U.S.C. §
> 12112(b)(4). More specifically, the Interpretive Guidelines to the ADA
> provide that an employer may not make decisions based on the "belie[f]
> that the [employee] would have to miss work" in order to take care of a
> disabled person. 29 C.F.R. § 1630, App. Tyndall contends that Seay's
> decision to terminate her stemmed from the assumption that Tyndall would
> have to take additional time off in order to take care of her disabled son,
> Kevin.

*Id.* at 214. *Tyndall* recognized a valid claim under these circumstances, but held, at the

summary judgment stage, that Plaintiff's claim failed because plaintiff had failed to show

the termination resulted from an assumption the plaintiff would miss additional work.

Likewise, the Appendix to Part 1630--Interpretive Guidance on Title I of the

Americans with Disabilities Act recognizes that it is unlawful to discriminate against an

15

employee because the employer believes the employee will "miss work or frequently leave work early" to care for a disabled family member:

> This provision is intended to protect any qualified individual, whether or not that individual has a disability, from discrimination because that person is known to have an association or relationship with an individual who has a known disability. This protection is not limited to those who have a familial relationship with an individual with a disability.

> To illustrate the scope of this provision, assume that a qualified applicant without a disability applies for a job and discloses to the employer that his or her spouse has a disability. The employer thereupon declines to hire the applicant because the employer believes that the applicant would have to miss work or frequently leave work early in order to care for the spouse. Such a refusal to hire would be prohibited by this provision.

29 C.F.R. Appendix to Part 1630.

Here, Plaintiff never claimed that she requested, and was denied, a reasonable accommodation to care for her son, and that she was entitled to such accommodation under the ADA.[4]  Instead, Plaintiff alleges that "Plaintiff was treated differently than similarly situated employees in that other employees not associated with a disabled family member were regularly permitted to take sick leave in less-than-half-day increments on temporary bases, and they were not retaliated against for talking leave or because of *anticipated future leave requirements*."  Compl. ¶ 30. (emphasis added). Plaintiff further alleged that she suffered "adverse employment actions – changes to her schedule and responsibilities, being placed on a PIP, and being forced to resign, among others – because of her specific association with her disabled son."  *Id*.

---

[4] This is Defendant's "straw man" argument set forth on pp. 21-22 of Defendant's brief [D.E. 9], and the basis of many of the decisions cited to support Defendant's argument for dismissal.

Plaintiff adequately alleges a plausible associational discrimination claim recognized under both *Tyndall* and the EEOC's Interpretative Guidelines.

Given the guidance of *Tyndall* and the Interpretative Guidelines, there is no requirement to pigeonhole Plaintiff's facts under the rubric set forth in *Larimer v. International Bus. Machines Corp.*, 370 F.3d 698 (7th Cir. 2004). *See* Defendant's brief [D.E. 9], pp. 18-19. Other courts have, however, found that similar facts fall under the "distraction" framework.

*Kouromihelakis v. Hartford Fire Ins. Co.* (D. Conn. 2014) 48 F. Supp.3d 175, is instructive. There, the district court denied an employer's motion to dismiss the plaintiff's claim that he was fired because of the known disability of his father. The plaintiff alleged that he had to regularly assist in the care of his disabled father, who had suffered a debilitating stroke. Although his job performance was excellent, he was periodically tardy because he was caring for his father. The plaintiff asked for, but was refused, a change in hours under the employer's "flex time" policy to accommodate his duties to his disabled father; and the employer terminated him after he arrived late one day. *Id.* at pp. 178, 180–181.) The court concluded these allegations were sufficient to plead a plausible "distraction" claim under *Larimer*, and, viewed in a light most favorable to the plaintiff, supported "a reasonable inference that the defendant terminated the plaintiff's employment based on a belief about future absences." *Kouromihelakis*, at pp. 180–181. Like *Kouromihelakis*, the allegations here give rise to the reasonable inference that Plaintiff's association with her disabled son and consequent need for leave to care for him

17

was a cause of the her disparate treatment and termination. *See also Castro-Ramirez v. Dependable Hwy. Express, Inc.*, 207 Cal. Rptr.3d 120, 134 (Ct. App. 2016) ("Neither *Kouromehelakis* nor this case fit neatly within the distraction paradigm set forth in *Larimer*, but a neat fit is not required.").

Likewise here Plaintiff alleged that she that she was treated differently and suffered adverse employment actions because of her association with her disabled son. Compl. ¶ 30. Plaintiff also alleged she was discriminated against for taking leave, and because of "anticipated future leave requirements." *Id.* As pled, Plaintiff states a viable claim for associational discrimination in violation of the ADA.

## IV. COMPLAINT STATES STRONG CASE OF RETALIATION.

"Under the burden-shifting framework, the plaintiff must first establish a prima facie case of retaliation by showing: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Strothers v. City of Laurel, Md*., 895 F.3d 317, 327 (4th Cir. 2018). In Part IV of Defendant's brief [D.E. 9, pp. 24-29], Defendant claims that Plaintiff has not adequately alleged "retaliation."

Defendant ignores that Plaintiff's claim of retaliation is many-fold. First, Plaintiff alleges that she is retaliated against because of her modest requests for temporary leave or schedule adjustments so she could care for her disabled son. Defendant has not contested that Plaintiff's son is disabled, having recently had surgery to remove a brain tumor and seeking ongoing treatment for recently diagnosed conditions associated with his disease.

18

Defendant has not contested that Principal Gould was aware of Plaintiff's son's disability. Defendant Principal Gould first addresses her leave request in a passive-aggressive manner, refusing to respond to her at all, providing no explanation, and apparently assuming his silence on the matter should be interpreted as a refusal to approve the request. HR later clarified that it was denying her modest request.

Importantly, Plaintiff does not allege – as Defendant suggests – that she was "entitled to" a reasonable accommodation in order to care for her disabled son. Instead, she asserts that "Plaintiff was treated differently than similarly situated employees in that other employees not associated with a disabled family member were regularly permitted to take sick leave in less-than-half-day increments on temporary bases." Compl. ¶ 30. She further alleges that after she complained that the rules were not being applied uniformly to her because of her disabled son, Defendant retaliated against her "for taking leave or because of anticipated future leave requirements." Under similar facts, courts have recognized valid claim for associational discrimination. *See Kouromihelakis v. Hartford Fire Ins. Co.*, 48 F. Supp.3d 175, 180-181 (D. Conn. 2014) (valid claim of associational discrimination alleged where plaintiff's leave requests denied and his employment terminated, supporting reasonable inference that he was terminated because of employer's belief of need to "miss additional work in the future" in order to care for disabled father). Thus, it is reasonable that Plaintiff would have believed that she could not be discriminated and retaliated against because of her similar requests.

19

Second, and more importantly, Plaintiff also bases her retaliation claims on her reporting that her supervisor was "bullying and retaliating against her" in a continuing and mounting course of disparate treatment after she reports that he is treating her differently on account of her disabled son. She was scolded for viewing a work-related email (although Principal Gould made it sound like it was personal email), using the restroom, and sending children to the principal's office for behavior concerns (which is the correct protocol). Compl. ¶ 18. This leads to the issuance of a bogus PIP plan, containing misstated facts and holding Plaintiff to standards not required of other employees. Placement of an employee on a bogus PIP[5] plan is recognized as an adverse employment action. "[T]here is no authority in the Fourth Circuit that holds that a PIP cannot be a materially adverse action." *Emami v. Bolden*, 241 F. Supp. 3d 673, 685 (E.D. Va. 2017) (court finds retaliatory placement on PIP, putting employment at jeopardy, constituted materially adverse action).

Although Plaintiff may not be entitled to reasonable accommodations to care for her disabled son, she is protected from retaliation when she attempts to negotiate such accommodations and then is subjected to retaliatory conduct aimed at getting her fired. She is protected for complaining about her ill treatment and the escalating nature of Principal Gould's unfair treatment meted out in retaliation for her complaints to Human

---

[5] Defendant contends that Plaintiff did not contest the PIP, but this assertion is flatly contradicted by the allegations in the Complaint – that that the PIP misstated facts and held Plaintiff to much higher standards than that require of other employees at a time when Plaintiff was performing satisfactorily. Compl., ¶¶ 18-22, 30.

Resources that he is treating her differently because of her association with her disabled son.

Defendant alleges there is no causal connection between her complaints about Principal Gould and the adverse employment actions she suffers. In support, Defendant contends that (1) there is insufficient temporal proximity and (2) there is no allegation of a negative animus. Both propositions fail.

First, regarding temporal proximity, Plaintiff alleges that that the retaliation begins almost immediately after her complaints about Principal Gould's behavior. Plaintiff grits out one week before Christmas vacation after her complaints, and upon her return, Principal Gould begins retaliating against her immediately ("throughout January and February 2017, Principal Gould began a course of relation against Plaintiff. Principal Gould began nitpicking Plaintiff and holding her to a much higher standard than the other teachers at the school. She was scolded for viewing a work-related email (although Principal Gould made it sound like it was personal email), using the restroom, and sending children to the principal's office for behavior concerns (which is the correct protocol)." Compl., ¶¶ 17-18.

Here, much of the first "month" after Plaintiff's first complaint on December 7, 2016, was consumed by the 3-4 week Christmas break. Plaintiff alleges that retaliatory treatment began almost immediately and only two months later, she was placed on a bogus PIP. Despite complying with all the terms of the PIP, she was forced to resign two months later, on May 12, 2017, about five months after her first complaint and only two

months after her follow-up complaint in mid-March 2017. The actual relevant time span of working days is closer to four months, and the intervening period is full of ongoing retaliatory treatment, including the bogus PIP. Courts are free to consider "the intervening time period for evidence of 'continuing retaliatory conduct and animus' to support causation." *Westmoreland v. Prince George's County*, 2015 WL 996752 (D. Md. Mar. 4, 2015) (*citing Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (lapse of 7 months between protected activity and termination did not defeat causation finding for lack of temporal proximity where plaintiff alleged continuing retaliatory conduct); *Elder v. DRS Tech., Inc.*, 2013 WL 4538777 (E.D. Va. Aug. 27, 2013) (noting court applies less stringent standard in assessing causation on motion to dismiss and that plaintiff "is not required to show a prima facie case of retaliation at this stage" but rather "must allow the Court to plausibly—or reasonably—infer the existence of the prima facie elements," court finds intervening acts over 23-month period support causation) (citations omitted).

Further, Plaintiff here alleges evidence of a negative animus. As noted earlier, Principal Gould acted unprofessionally and discourteously when he failed to respond to Plaintiff Schmitz's leave requests. Principal Gould continues this passive-aggressive conduct when he fails to contact Plaintiff and give her any guidance even though he stated he would speak to her the following day. These actions demonstrate a negative animus toward the Plaintiff's requests for leave related to her disabled son. Defendant never explains why leaving earlier was okay for one week, but suddenly not permitted the following week. If we are to take Principal Gould's glowing remarks at their face value,

22

why was Plaintiff put on a bogus PIP plan?  Why would Principal Gould chide her for reviewing emails during work when he knew it was a work-related email she was reviewing?  Why would he question her brief absence when she was merely using the restroom as all teachers did?  Why would he call her out for "sending too many children" to his office when all such children were sent according to school policy?  In answering all of these questions, the Court should infer a negative animus and retaliatory conduct directed to toward Plaintiff because of her engagement in protected activities.

As such, Plaintiff satisfies the causation requirement at this stage of proceedings.

## V. COURT SHOUD NOT DETERMINE COMPLEX STATE LAW QUESTION AT THIS JUNCTURE.

Defendant also asserts that the Court should dismiss Plaintiff's state law claim for wrongful termination in violation of public policy.  Defendant asserts that North Carolina does not recognize a claim for "constructive discharge."

First, it must be noted that there are two distinct situations encompassed by the phrase "constructive discharge."  First, there are those where an employer intentionally makes working conditions so intolerable that the employee is forced to resign.  Second, there are situations where, as here, an employer takes action incompatible with continued employment, and essentially advises the employee that their employment is ending, whether by termination or resignation.

Given the uncertainty of North Carolina law, the Court should not dismiss these claims at this juncture.  *See, e.g. McHan v. Cherokee Cty.*, 2016 U.S. Dist. LEXIS 90604 (W.D.N.C. Dec. 13, 2006)(unpub.)( denying motion to dismiss since supreme court's

23

reversal in *Whit v. Harris Teeter*, 614 S.E.2d 531 (N.C. 2005), was not elucidating and N.C. courts have previously recognized constructive discharge as wrongful discharge); *Garner v. Rentenbach Constrs., Inc.,* 515 S.E.2d 328 (N.C. 1999) (reiterating view that seminal *Coman* case encompassed a constructive discharge claim).

Given the distinguishable nature of Plaintiff's claim of constructive discharge and the unsettled nature of the law, this court should decline to dismiss Plaintiff's WDPP claims at this juncture.

For the reasons stated herein, the court should deny Defendant's Motion to Dismiss in full.

This, the 14th day of January, 2019.

OF COUNSEL:
HIGGINS BENJAMIN, PLLC       /s/ Jon Wall
301 N. Elm Street, Suite 800       Jonathan Wall
Greensboro, NC 27401-2260       N.C. State Bar No. 22839
(336) 273-1600
jwall@greensborolaw.com       *Attorney for Plaintiff*

## CERTIFICATE OF WORD COUNT

The undersigned certifies that he has utilized the word-count feature of his word processing software, which indicates the document has under 6,250 words, and is therefore in compliance with LR 7.3(d).

This, the 14th day of January, 2019.

_/s/ Jon Wall_____


## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification and a copy of such filing electronically to Adam S. Mitchell of the law firm of Tharrington Smith, LLP at amitchell@tharringtonsmith.com, *Attorney for Defendant.*

This, the 14th day of January, 2019.

__/s/Jon Wall_____
Attorney for Plaintiff