IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THERESA SCHMITZ,                    )
                                    )
             Plaintiff,             )
                                    )
     v.                             )          1:18CV910
                                    )
ALAMANCE-BURLINGTON BOARD           )
OF EDUCATION, d/b/a ALAMANCE-       )
BURLINGTON SCHOOL SYSTEM,           )
                                    )
             Defendant.             )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before this court is Defendant's Motion to Dismiss, (Doc. 8), pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted. Plaintiff is a former elementary school teacher employed by Defendant, the Alamance-Burlington Board of Education. Plaintiff's complaint includes three counts: (1) associational discrimination under the Americans with Disabilities Act ("ADA"); (2) retaliation under the ADA; and (3) wrongful termination in violation of North Carolina Public Policy. (Complaint ("Compl.") (Doc. 5).) Defendant filed a Brief in Support of its Motion to Dismiss, (Doc. 9), and Plaintiff filed a Response and then an Amended Memorandum of Law in Opposition to Defendant's Motion to

Dismiss, (Docs. 13, 14). The issue is now ripe for ruling. For the reasons set forth herein, this court will grant Defendant's motion as to Counts Two and Three, but will deny the motion as to Count One.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are alleged in the complaint and taken as true.

### A. Factual Background

Theresa Schmitz ("Plaintiff") is a resident of Wake County, North Carolina. (Compl. (Doc. 5) ¶ 3.) The Alamance-Burlington Board of Education ("Defendant") is a corporate body solely based and operating in Alamance County, North Carolina. (Id. ¶ 4.) Defendant employs more than 500 employees and is a covered entity under the ADA. (Id. ¶ 5.) This court has jurisdiction pursuant to 28 U.S.C. §§ 1343(a)(4) and 1367. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1).

Defendant hired Plaintiff in late October 2016 to teach fourth grade at an elementary school in Snow Camp, North Carolina. (Id. ¶ 6.) Plaintiff alleges that she performed satisfactorily throughout her first months, receiving positive feedback. (Id. ¶ 7.) In November 2016, her son was diagnosed with a brain tumor and required emergency surgery. (Id. ¶ 8.) Plaintiff alleges she returned to work on November 29, 2016,

after her son's surgery on November 23. (Id.) Plaintiff's son was diagnosed with neurofibromatosis Type 1 ("NF1"), a disease also known as von Recklinghausen's Disease. (Id. ¶ 9.) NF1 is a rare genetic disorder that causes tumors and growths in certain parts of the body; it negatively affected Plaintiff's son's ability to see, think, and learn. (Id.) Plaintiff's son was unable to walk or care for himself following surgery. (Id.) Plaintiff's son requires regular screenings and chemotherapy as a result of the disease. (Id.)

After returning to work on November 29, Plaintiff asked her Principal, Mark Gould, for permission to leave work at 2:30 p.m. each day to care for her son. (Id. ¶ 11.) Though classes ended at 2:30 p.m., teachers were expected to stay until 3:15 p.m. each day. (Id.) Principal Gould allowed Plaintiff to leave at 2:30 p.m. for one week, from November 29 until December 5. (Id.)

On or about December 5, Plaintiff took her son to the doctor to have his stitches removed; at that appointment, the doctor informed Plaintiff that her son would not be able to return to school for several weeks. (Id. ¶ 12.) Plaintiff emailed Principal Gould following that meeting, explaining the situation and asking for permission to leave at 2:30 p.m. for another week. (Id. ¶ 13.) Principal Gould responded that he could not talk about it at that moment because he was busy, but

that he would discuss it with Plaintiff the next day. (Id.)
Plaintiff never heard from Principal Gould, but she still left
2:30 p.m. the next day, December 6. (Id. ¶ 14.) Later that day,
Principal Gould emailed Plaintiff to ask why she had not been at
bus duty at 2:30 p.m. that day. (Id.) "Plaintiff replied that
she had explained her situation with her son and thought it was
okay to leave at 2:30 p.m. When she received no response back,
she became very concerned." (Id.) Plaintiff told Principal Gould
that she would not be at work on December 7. (Id.)

On December 7, Plaintiff contacted Defendant's human
resources ("HR") department to explain the situation with her
son and to express concern that Principal Gould was "bullying
her and retaliating against her for caring for her disabled
son." (Id. ¶ 15.) The HR department responded that day and told
Plaintiff she was not permitted to leave at 2:30 p.m., but
instead would have to take leave in half-day increments. (Id.
¶ 16.) Plaintiff alleges she asked HR why she could not work
until 2:30 and have her pay prorated for the final forty-five
minutes of the day, but she received no response. (Id.)

Plaintiff alleges that she was treated differently in this
regard, because "other employees not associated with a disabled
family member were regularly permitted to take sick leave in

less-than-half-day increments on temporary bases." (Id. ¶ 30.)[1]
Still, Plaintiff complied with HR's instruction and took leave
in half-day increments from December 5 until December 16. (Id.
¶ 16.) After December 16, 2016, Plaintiff alleges she did not
request, nor did she take any other time off to care for her
son. (Id.)

Plaintiff alleges that Principal Gould began a course of
retaliation against her starting in mid-December 2016 and
carrying into February 2017. (Id. ¶ 17.) This alleged
retaliation, which Plaintiff characterizes as "nitpicking,"
allegedly resulted in Plaintiff being held to a higher standard
than other teachers. (Id. ¶ 18.) Plaintiff was placed on a
performance improvement plan ("PIP") on or about March 14, 2017.
(Id. ¶ 20.) Plaintiff alleges this PIP entailed a lot of busy
work, was based on misstated facts about her performance, and
was another example of how she was held to a higher standard
than other teachers. (Id. ¶¶ 20–21.)

Nonetheless, Plaintiff successfully completed her PIP. (Id.
¶ 21.) Plaintiff also alleges she was performing satisfactorily

---

[1] It is unclear from Plaintiff's allegations if this
practice of allowing others to take leave in less than half-day
increments continued after Plaintiff's permission to do so
ended. It is also unclear what constituted a "temporary basis,"
as Plaintiff was allowed to leave at 2:30 p.m. for approximately
one week.

in April 2017; to support this contention, Plaintiff excerpts

the following portion from one of her performance reviews:

> [Ms. Schmitz] has very capably taught math, reading, social studies, and science.
>
> Ms. Schmitz is to be commended for her professionalism, concern for her students, and quality of instruction. She plans well and works diligently at being organized. Her preparation each day is thorough and the results, evident. Her assignments and assessments are well-conceived, quickly corrected, and promptly returned. I have found Ms. Schmitz to be uniquely resourceful and adaptive.
>
> Student respect is obvious in her classroom. She deeply cares about her students and they look to her for approval and guidance. Her approach to teaching has generated a warm and close rapport with her classes as well as our faculty.
>
> Ms. Schmitz has the skills to be an outstanding teacher. . . .

(Id. ¶ 22.) Plaintiff alleges that the report was written at

some point during April 2017. (Id.)

Despite those positive developments, on May 12, 2017,

Plaintiff was called into a meeting with Principal Gould and HR.

(Id. ¶ 23.) Waiting for her in the meeting was a pre-drafted

letter of resignation for her to sign, effective at the end of

the school year. (Id.) Plaintiff was told to sign the letter, or

she would be "put on a list she did not want to be on." (Id.)

Plaintiff alleges this list was "presumably a list of terminated

employees or employees who were not eligible for hire" within

North Carolina's school systems. (Id.) Plaintiff was told she had to sign and "turn in" the letter. (Id.) Plaintiff does not expressly allege that she signed the letter, but she does allege that she was "forced to resign," (id. ¶ 30), and that she was "constructively terminated," (id. ¶ 24).

Plaintiff alleges she was retaliated against in the form of changes to her schedule and responsibilities, being placed on a PIP, being forced to resign, and other, smaller acts. (Id. ¶ 30.)

### B.  **Procedural History**

Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a right-to-sue letter on July 14, 2018, or later. (Compl. (Doc. 5) ¶ 26.) Plaintiff filed suit in the Superior Court of Guilford County, North Carolina, on October 5, 2018. (Id. at 1.) The complaint contains three counts. First, Plaintiff claims she was discriminated against because of her association with her disabled son. (Id. ¶¶ 27-31.) Plaintiff alleges that the discriminatory acts included disparate treatment and termination "because of anticipated future leave requirements." (Id. ¶ 30.) Second, Defendant claims she was retaliated against for opposing activity she reasonably believed to be in violation of the ADA. (Id. ¶¶ 33-37.) Third and finally, Plaintiff brings a state law

−7−

claim, alleging that her termination was in contravention of the public policy of North Carolina as stated in N.C. Gen. Stat. §§ 143-422.2, 95-28.1A, and 115C-302.1, as well as 16 N.C. Admin. Code § 6C.0402. (<u>Id.</u> ¶¶ 38-42.)

Defendant timely removed the complaint to this court on October 30, 2018. (Petition for Removal (Doc. 1).) Defendant filed a Motion to Dismiss, (Doc. 8), pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, (Doc. 8), as well as a supporting brief. (Def.'s Mem. of Law in Supp. of Mot. to Dismiss ("Def.'s Br.") (Doc. 9).) Plaintiff filed a response in opposition to the motion to dismiss, (Doc. 13), and then quickly filed an amended response. (Am. Mem. of Law in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Am. Resp.") (Doc. 14).) Defendant did not file a reply.[2]

## II.  <u>STANDARD OF REVIEW</u>

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v.</u>

---

[2] While the court does not encourage lengthy briefing, the absence of a reply in this case causes some difficulty with the analysis. Plaintiff has adduced a number of facts in her response that present different issues from those in the original motion.

Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable" and demonstrates "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556–57). When ruling on a motion to dismiss, this court accepts the complaint's factual allegations as true. Iqbal, 556 U.S. at 678. Further, this court liberally construes "the complaint, including all reasonable inferences therefrom, . . . in plaintiff's favor." Estate of Williams-Moore v. All. One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004) (citation omitted). This court does not, however, accept legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

ADA associational discrimination and retaliation claims utilize the McDonnell-Douglas framework when claimants lack direct evidence of discrimination or retaliation. See Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 155 (4th Cir. 2012); Stansberry v. Air Wis. Airlines Corp., 651 F.3d 482, 487 (6th Cir. 2011); Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995). Complaints raising ADA causes of action must meet the Twombly/Iqbal plausibility standard; a

plaintiff is not required to make out a prima facie case of discrimination or retaliation or satisfy any heightened pleading requirements at the motion to dismiss stage. See <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 511 (2002); <u>McCleary-Evans v. Md. Dep't of Transp.</u>, 780 F.3d 582, 584–85 (4th Cir. 2015). The plaintiff need only plead facts that permit the court to reasonably infer each element of the prima facie case. See <u>McCleary-Evans</u>, 780 F.3d at 585; see also <u>Coleman v. Md. Ct. App.</u>, 626 F.3d 187, 191 (4th Cir. 2010) (stating, in the Title VII context, that a complaint must "assert facts establishing the plausibility" that plaintiff was terminated based on race).

III. **ANALYSIS**

The court addresses each of Plaintiff's three claims in turn, finding that Plaintiff has only plausibly alleged a claim for associational discrimination under the ADA. Plaintiff has failed to plausibly allege her claims for retaliation under the ADA or wrongful termination under North Carolina public policy.

A. **Count One: Associational Discrimination**

Plaintiff's first claim is that Defendant discriminated against her under the ADA's associational discrimination provision. (Compl. (Doc. 5) ¶¶ 27–31.) Plaintiff claims she was discriminated against because (1) she was treated differently in the way she was allowed to take leave, and (2) she was

terminated based on Defendant's unfounded beliefs about her
future availability for work. (Id. ¶ 30.) Defendant argues, in
support of its motion to dismiss, that Plaintiff did not
plausibly allege an adverse employment action, and, even if
plausible, her associational discrimination claim does not fit
any of the traditional associational discrimination molds.
(Def.'s Br. (Doc. 9) at 7, 17.) Because Plaintiff has alleged
sufficient facts to plausibly support her ADA associational
discrimination claim, Defendant's motion to dismiss on that
count will be denied.

The ADA's association provision prohibits discrimination
"because of the known disability of an individual with whom the
qualified individual is known to have a relationship or
association." 42 U.S.C. § 12112(b)(4). Congress added the
association provision to "protect qualified individuals from
adverse job actions based on unfounded stereotypes and
assumptions arising from the employees' relationships with
particular disabled persons." Freilich v. Upper Chesapeake
Health, Inc., 313 F.3d 205, 215 (4th Cir. 2002) (quoting
Oliveras-Sifre v. P.R. Dep't of Health, 214 F.3d 23, 26 (1st
Cir. 2000)).

Associational discrimination under the ADA is defined as
"excluding or otherwise denying equal jobs or benefits to a

-11-

qualified individual because of" their association with a disabled person. 42 U.S.C. § 12112(b)(4). "[T]he association provision prohibits an employer from, inter alia, refusing to hire a job applicant because of the employer's unfounded belief 'that the applicant would have to miss work or frequently leave work early in order to care for [a disabled relative].'" Erdman v. Nationwide Ins. Co., 582 F.3d 500, 510–11 (3d Cir. 2009) (quoting 29 C.F.R. § 1630.8, App.).[3] "Other courts [including the Fourth Circuit] have surmised that an employee would be protected by the association provision if she were fired because her employer feared she might miss work to care for a disabled relative . . . ." Id.

In order to make out a claim for associational discrimination under the ADA, a plaintiff must establish four elements:

---

[3] Defendant argues that Plaintiff's claim does not fit any of the three associational discrimination models as laid out by Judge Posner in Larimer v. Int'l Bus. Machs. Corp., 370 F.3d 698, 701 (7th Cir. 2004). Though Plaintiff's claim arguably fits the third "distraction" model, the point is irrelevant — Plaintiff's claim need not fit into one of Judge Posner's categories. See Stansberry, 651 F.3d at 487 ("[T]he three theories articulated in Larimer are not necessarily an exhaustive list . . . ."); see also Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 214 (4th Cir. 1994) (noting that an associational claim can exist where an employer terminates an associated employee for unfounded beliefs about future absences).

(1) she was associated with an individual with a
disability as defined by the ADA and that her employer
had knowledge of that association; (2) she suffered an
adverse employment action; (3) at the time of such
action, she was performing her job at a level that met
her employer's legitimate expectations; and (4) the
adverse employment action occurred under circumstances
that raise a reasonable inference of unlawful
discrimination.

Macher v. Highland Trace Apartments, Civil Action No. 3:17-cv-

00682-RJC-DSC, 2018 WL 7247138, at *3 (W.D.N.C. July 23, 2018),

report and recommendation adopted, No. 3:17-cv-00682-RJC-DSC,

2019 WL 464970 (W.D.N.C. Feb. 6, 2019) (citing Ennis, 53 F.3d at

58). Because the statutory definition of associational

discrimination is defined as "excluding or otherwise denying

equal jobs or benefits to a qualified individual because of"

their association with a disabled person, the test in Ennis is

similar to those recognized by other circuits. See Graziadio v.

Culinary Inst. of Am., 817 F.3d 415, 432 (2d Cir. 2016);

Stansberry, 651 F.3d at 487; Larimer, 370 F.3d at 701; Hilburn

v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1230-31 (11th Cir.

1999); Den Hartog v. Wasatch Acad., 129 F.3d 1076, 1085 (10th

Cir. 1997).

Other than the first element, about which there appears to

be no serious contention,[4] the court addresses each element in

---

[4] See Def.'s Br. (Doc. 9) at 7-24; Compl. (Doc. 5) ¶¶ 11-16.

turn, finding that Plaintiff has plausibly alleged a claim of associational discrimination.

### 1. Second Element: Plaintiff was Subjected to an Adverse Employment Action

Defendant contends that none of the alleged actions by Defendant or Principal Gould qualify as "adverse employment actions" for the purpose of an associational discrimination claim. (Def.'s Br. (Doc. 9) at 7.) Plaintiff stakes her associational discrimination claim on three alleged actions by Defendant: (1) changes to her schedule and responsibilities, (2) being placed on a PIP, and (3) being forced to resign.[5] (Compl. (Doc. 5) ¶ 30.) Because the court finds that Plaintiff has plausibly alleged that she was constructively discharged, the court only addresses that ground and will address others at a later stage, or trial, as necessary.

The Fourth Circuit analyzes adverse employment actions under the ADA using the same framework as in Title VII cases. See, e.g., Adams v. Anne Arundel Cty. Pub. Sch., 789 F.3d 422,

---

[5] Defendant argues that Plaintiff's complaint fails first because she neglects to even allege that she resigned or was terminated. (Def.'s Br. (Doc. 9) at 10 ("Plaintiff does not allege that she was terminated by the Defendant.").) Though spread throughout the complaint, Plaintiff does, in fact, allege that she resigned her position and/or was terminated. (Compl. (Doc. 5) ¶¶ 30, 31, 35, 39.) While this allegation may be inartfully pled, it is, nevertheless, pled.

-14-

431 (4th Cir. 2015). A discharge qualifies as an adverse employment action. Strothers v. City of Laurel, 895 F.3d 317, 328 (4th Cir. 2018). Beyond termination, courts have also applied the doctrine of constructive discharge to instances where an employee resigned. See, e.g., Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 174 (4th Cir. 1988) (discussing constructive discharge in the Section 1983 due process context); see also Corbin v. Fed. Express, Action No. 4:15cv139, 2017 WL 4485899, at *8 (E.D. Va. May 19, 2017), aff'd, 717 F. App'x 319 (4th Cir. 2018), cert. denied, ____ U.S. ____, 139 S. Ct. 232 (2018) (noting the Fourth Circuit's use of Stone's constructive discharge reasoning in the Title VII context). A constructive discharge is a facially voluntary resignation that is actually "so involuntary that it amounted to a constructive discharge . . . ." Stone, 855 F.2d at 173. There are two situations where courts have found a constructive discharge occurred when the employee resigned: "(1) where obtained by the employer's misrepresentation or deception, and (2) where forced by the employer's duress or coercion." Id. at 174. In both situations, the overarching question is whether the employee was essentially without any free choice. Id.

Plaintiff argues that the resignation letter could be classified as either an act of coercion or misrepresentation.

(Pl.'s Am. Resp. (Doc. 14) at 13.) Because the court finds that
Plaintiff has plausibly alleged that she was constructively
discharged under a coercion theory, it addresses only that
analysis.

"Under the duress/coercion theory, a resignation may be
found involuntary if on the totality of circumstances it appears
that the employer's conduct in requesting resignation
effectively deprived the employee of free choice in the matter."
Stone, 855 F.2d at 174 (internal quotation marks omitted). In
analyzing the totality of the circumstances, the court must
objectively assess whether "real alternatives" to resignation
were offered. Id. (noting that an employee's subjective concerns
about her reputation would be irrelevant to the analysis). The
Stone court laid out a non-exhaustive list of factors to
consider when assessing the voluntariness of a resignation, to
include: "(1) whether the employee was given some alternative to
resignation; (2) whether the employee understood the nature of
the choice [s]he was given; (3) whether the employee was given a
reasonable time in which to choose; and (4) whether [s]he was
permitted to select the effective date of resignation." Id.
However, if an employee "can show that the [employer] knew that
the reason for the threatened removal could not be
substantiated, the threatened action by the agency is purely

coercive." <u>Schultz v. U.S. Navy</u>, 810 F.2d 1133, 1136 (Fed. Cir. 1987); <u>see also</u> <u>Stone</u>, 855 F.2d at 174 ("[T]he mere fact that the choice is between comparably unpleasant alternatives . . . does not of itself establish that a resignation was induced by duress or coercion . . . . This is so even where the only alternative to resignation is facing possible termination for cause, <u>unless</u> the employer actually lacked good cause to believe that grounds for termination existed." (emphasis added)).

Plaintiff alleges that on May 12, 2017, Principal Gould called her into his office for a meeting with him and "HR." (Compl. (Doc. 5) ¶ 23.) Plaintiff alleges that waiting for her was a pre-drafted resignation letter for her to sign. (<u>Id.</u>) She was told that if she did not sign the letter, she would be "put on a list she did not want to be on." (<u>Id.</u>) This list was "presumably" a list of teachers who were terminated or of teachers who are not eligible for rehiring. (<u>Id.</u>) Defendant argues that there is no constructive discharge, because Plaintiff could refuse to sign the resignation letter and fight her termination. (Def.'s Br. (Doc. 9) at 13.) Analyzing the facts, using the <u>Stone</u> factors, suggests that Plaintiff has alleged enough facts to plausibly claim that the incident with

Principal Gould and HR amounts to a coercive constructive discharge.[6]

Beginning with the first factor, Plaintiff fails to plausibly allege that she was not presented with an alternative to resignation, but she also alleges facts from which it can be reasonably inferred that Defendant lacked a good faith reason for the termination. For that reason, the first factor supports a conclusion that the resignation was "purely coercive." Defendant threatened to put Plaintiff "on a list she did not want to be on" if she did not resign, but Plaintiff does not specifically allege what list that was. (Compl. (Doc. 5) ¶ 23.) Instead, Plaintiff "presumes" that it was a list of "terminated employees or employees who were not eligible for hire within the State's public school systems . . . ." (Id. ¶ 23 (emphasis added).) The imprecision of Plaintiff's allegation is notable when compared, for example, to another case involving a terminated teacher in the Western District of North Carolina, in which the district court found there was a constructive discharge. See Dubois v. Henderson Cty. Bd. of Educ., Civil No.

_____

[6] It is true, as Plaintiff argues, that she is not required to plead facts supporting all the factors. (See Pl.'s Am. Resp. (Doc. 14) at 14 n.2.) Still, Plaintiff is required to plausibly allege a constructive discharge and the factors are helpful in determining whether she has done so.

1:13-cv-00131-MR-DLH, 2014 WL 340475, at *3 (W.D.N.C. Jan. 30, 2014) ("Defendant . . . informed Plaintiff that if he did not resign, Defendant . . . would . . . ask the State of North Carolina to revoke Plaintiff's teaching license."). Regardless of what list Plaintiff was actually threatened with, she has not provided facts supporting the conclusion that it was the "Hobson's choice" she alleges it was, even if the list was the worse of the two options. (Pl.'s Am. Resp. (Doc. 14) at 1.)[7] Indeed, constructive discharge claims have faltered when plaintiffs were faced with more difficult options than Plaintiff faced here; courts have found that even when the alternative to resignation includes disciplinary or criminal charges, there is still a choice. See Stone, 855 F.2d at 174 (collecting cases).

---

[7] Plaintiff cites to two Fourth Circuit district court cases that she claims support her position that a "resign or be terminated" situation presents no choice at all. (Pl.'s Am. Resp. (Doc. 14) at 11-12.) The court finds these authorities distinguishable from Plaintiff's case. First, in Bauer v. Holder, the plaintiff had been terminated from the FBI's New Agent Training Program for failure to meet physical standards. 25 F. Supp. 3d 842, 846 (E.D. Va. 2014), vacated sub nom. on other grounds, Bauer v. Lynch, 812 F.3d 340 (4th Cir. 2016). That trainee was only given the choice between immediate resignation or immediate termination. Id. at 852. In either case, the effect was immediate. The other case, Hudock v. Kent Cty. Bd. of Educ., dealt with "immediate" termination or resignation. Civil No. CCB-14-2258, 2015 WL 1198712, at *16 (D. Md. Mar. 16, 2015). Here, by contrast, Plaintiff's termination and resignation were apparently not to take effect until the end of the school year. (Compl. (Doc. 5) ¶ 23.)

Even under those circumstances, plaintiffs can still "stand pat and fight" by choosing to pursue administrative and legal remedies rather than resignation. Id. (quoting Christie v. United States, 518 F.2d 584, 587–88 (Ct. Cl. 1975)). Plaintiff here does not allege any facts indicating she could not fight her placement on either list.

Still, despite Plaintiff's failure to plausibly allege that she did not have an option other than resignation, she has alleged facts that allow this court to reasonably infer that Defendant lacked a good faith basis for threatening her with termination in the first place, as stated in Stone. See 855 F.2d at 174. As noted above, if an employer does not have "good cause" to threaten termination, then a choice between resignation and termination is one made under duress. See id. at 174–75 (citing Schultz, 810 F.2d at 1136). In that situation, the "threatened action by the [employer] is purely coercive." Schultz, 810 F.2d at 1136.

Plaintiff alleges that she successfully completed her PIP. (Compl. (Doc. 5) ¶ 21.) She also alleges that Principal Gould had recently informed her, in the form of a positive performance review, that she had been performing satisfactorily; in support of that allegation, Plaintiff cites from that performance review written by Principal Gould at some point during April 2017. (Id.

¶ 22.) That report contained the following remarks: "Ms. Schmitz is to be commended for her professionalism, concern for her students, and quality of instruction. . . . Student respect is obvious in her classroom," as well as other commendations. (Id.) These facts support an inference that Principal Gould did not have "good cause to believe that grounds for termination existed." Stone, 855 F.2d at 174–75. That inference may be rebutted at later stages, but at this point in the proceedings, it must be drawn in Plaintiff's favor.

The second Stone factor is whether the employee understood her options. Based on Plaintiff's factual allegations, this factor does not support a finding either for or against voluntariness. Plaintiff's own pleadings expose her confusion about the choice she was being offered. Plaintiff alleges that Principal Gould or HR told her "she would be put on a list she did not want to be on." (Compl. (Doc. 5) ¶ 23.) Plaintiff alleges that list was "presumably" one of two lists: one for terminated employees, or one of teachers who were not eligible for rehire within the state. (Id.) It is not clear from her allegations if Plaintiff's ignorance was a product of Principal Gould's opacity or her own lack of experience with such matters. In the absence of additional facts describing the basis of Plaintiff's presumption or to provide additional context, it is

not clear whether the threat meant what Plaintiff presumed. Nevertheless, Plaintiff's pleading permits a reasonable inference that the suggestion of a "list" was a threat of some undesirable consequences if she refused to resign. Although it is a close issue, this court finds the inference sufficient. Whether the threat occurred or was a threat at all will be better addressed at a later stage.

The third Stone factor, whether the employee had a reasonable amount of time to consider her options, does not support an inference that Plaintiff's resignation was voluntary. If a plaintiff has little or no time to consider her choices, then the choice she makes is more likely one made under duress. Stone, 855 F.2d at 174. A demand for an immediate decision from an employee points to coercion, because it deprives the employee of the chance to consult a handbook, co-workers, or perhaps even legal counsel. See, e.g., Bauer, 25 F. Supp. 3d at 853 ("[P]laintiff was required to make his decision right then and there, and after he opted to resign, effective immediately, plaintiff was required, on-the-spot, to handwrite his resignation letter using an FBI-provided template."); Hargray v. City of Hallandale, 57 F.3d 1560, 1570 (11th Cir. 1995) (discussing cases where coercion was found in instances where employees were not allowed to leave the room before making a

decision). As the cases relied on by Plaintiff show, the third factor usually only points to coercion if a decision must be made before the employee leaves the meeting. See Hudock, 2015 WL 1198712, at *16; Bauer, 25 F. Supp. 3d at 853; cf. Keyes v. District of Columbia, 372 F.3d 434, 436, 439–40 (D.C. Cir. 2004) (finding that fifteen days to consider options points to voluntariness). This conclusion is buttressed by Dubois, a case also involving a North Carolina teacher alleging constructive discharge. In Dubois, it was the plaintiff's factual allegations about his lack of time to consider the choice that allowed his case to survive a motion to dismiss. Dubois, 2014 WL 340475, at *7. The plaintiff-teacher in that case asked for permission to reach out to his attorney, a representative in the teacher's organization of which he was a member, or even his wife, but was denied permission to speak to any of them. Id. Further, the Eleventh Circuit has noted that it is not enough to be forced to sign before leaving the meeting, but there must be other "coercive" factors in play before the amount of time to consider options is unreasonable. See Hargray, 57 F.3d at 1570.

In contrast to Dubois, Bauer, Hudock, and other cases, Plaintiff here does not allege that she was required to make a decision before leaving the meeting with Principal Gould and HR. (Compl. (Doc. 5) ¶ 23.) Instead, Plaintiff alleges she was

handed the letter of resignation and told she had to "sign and turn [it] in." (Id.) Furthermore, Plaintiff's resignation was not effective "until the end of the school year," a date that was apparently beyond the meeting on May 12. (Id.) These are the only facts Plaintiff alleges about the May 12 meeting. They suggest that Plaintiff had time to consider her choices. "Turn in" implies that she would be returning the letter at another time, not that moment. The fact that her resignation would not be effective until later in the school year is significant, because it offers further support that the requested resignation was not effective immediately. Without any allegations she was required to sign the letter before she left the meeting, this court will not assume Plaintiff was forced to sign the letter before leaving the meeting. The third factor, the amount of time Plaintiff had to consider her options, points to the voluntariness of Plaintiff's decision to resign.

Finally, under the fourth Stone factor, if an employee is permitted to choose her resignation date, then that shows a degree of voluntariness. Stone, 855 F.2d at 174. Plaintiff alleges that the effective date of her resignation was included in the pre-drafted letter, (Compl. (Doc. 5) ¶ 23), a fact that indicates a lack of voluntariness.

-24-

Plaintiff has plausibly alleged that she was constructively discharged under at least two of the Stone factors. Notably, and ultimately persuasive to this court with respect to these pleadings, is the stark contrast between Plaintiff's allegations about her successful performance at the end of the school year and the allegedly abrupt way in which she was forced to resign. An involuntary resignation analysis is ultimately an objective one that looks to the totality of the circumstances. Stone, 855 F.2d at 174. Although this is a close call because the third factor weighs against a finding that Plaintiff has plausibly alleged a constructive discharge, this court finds Plaintiff has alleged circumstances that plausibly support a constructive discharge claim for purposes of this stage of the proceedings. The alleged absence of any good cause for a compelled resignation and the vague, but arguably coercive, circumstances of the demand for resignation are sufficient to plausibly state a claim.[8]

---

[8] These facts present a close call. As described herein, establishing a coercive discharge is demanding, and the analysis is heavily dependent upon the facts and circumstances of the resignation. Later stages of this proceeding, during which Defendant will have an opportunity to present facts, could readily undermine a claim of coercive discharge.

## 2. Third Element: Meeting Employer's Legitimate Expectations

In its motion to dismiss, Defendant does not appear to seriously challenge the third prong, but the court will nevertheless briefly address it.

A plaintiff must be qualified to do her job before her termination can be unlawful under the ADA. See, e.g., Stansberry, 651 F.3d at 487. Under Section 12112(b)(4), "[t]he term 'qualified individual' . . . must simply mean qualified to do one's job." Larimer, 370 F.3d at 700. Qualified means one has both the skills to do the job and the ability to show up when needed. See Tyndall, 31 F.3d at 213 ("In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis."); Ennis, 53 F.3d at 61 (noting an employee's tardiness as a negative factor justifying corrective action and termination).

Plaintiff has plausibly alleged that she was meeting Defendant's expectations. First, though Plaintiff was a teacher and did miss class time to care for her son, those instances allegedly ceased in December 2016, (Compl. (Doc. 5) ¶ 16), and it appears that those absences were approved leave. Between the time her absenteeism ceased and when she was shown her

pre-drafted resignation, Plaintiff alleges she was "performing satisfactorily." (Id. ¶ 22.) This conclusion is supported by a lengthy quote from a performance report written by Principal Gould at some point during April 2017. (Id.) The quoted material does not indicate any deficiencies in Plaintiff's performance or that she was not qualified to do the job. Plaintiff has plausibly alleged that she was meeting Defendant's expectations at the time she was constructively discharged.

### 3. Fourth Element: Reasonable Inference of Unlawful Discrimination

The final element of the prima facie case is showing that the adverse action "occurred under circumstances that raise a reasonable inference of unlawful discrimination." Ennis, 53 F.3d at 58. Discriminatory motivation need not be conclusively proved at the motion to dismiss stage, but a plaintiff must allege enough facts to draw the reasonable inference that she was terminated "because of" her association with a disabled person. See Erdman, 582 F.3d at 510; McCleary-Evans, 780 F.3d at 585. Put another way, "the plaintiff [must] present evidence indicating it is more likely than not the employer took the adverse action . . . because of the plaintiff's association with a disabled individual." Magnus v. St. Mark United Methodist Church, 688 F.3d 331, 337 (7th Cir. 2012) (quoting Timmons v.

Gen. Motors Corp., 469 F.3d 1122, 1127 (7th Cir. 2006)); see also Hilburn, 181 F.3d at 1230–31 ("[T]he adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative was a determining factor in [the defendant's] decision." (quoting, Hartog, 129 F.3d at 1085)). Following the Supreme Court's decision in Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009), the Fourth Circuit has interpreted the ADA's "because of" language to require "but for" causation: but for the disability (or association with a disabled person), the employer would not have taken the adverse action. Gentry v. E. W. Partners Club Mgmt. Co., 816 F.3d 228, 234 (4th Cir. 2016); see also Lewis v. Humboldt Acquisition Corp., 681 F.3d 312 (6th Cir. 2012) (en banc); Serwatka v. Rockwell Automation, Inc., 591 F.3d 957 (7th Cir. 2010).

At the motion to dismiss stage, courts "examine the complaint to determine whether it contains 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" Kelleher v. Fred A. Cook, Inc., 939 F.3d 465, 470 (2d Cir. 2019) (quoting Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015)). If a plaintiff is performing her job satisfactorily and her only issues with her employer revolve around her association with a disabled person,

-28-

then that can raise an inference of discriminatory motivation.
See Dewitt v. Proctor Hosp., 517 F.3d 944, 948 (7th Cir. 2008)
(noting that evidence of discriminatory motivation existed when
employee was performing job well and only issue with employer
revolved around healthcare costs for disabled dependent); Strate
v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1020 (8th Cir. 2005)
(noting, in the summary judgment context, that a plaintiff's
"apparently unblemished employment history with the Bank,
spanning more than a decade of work, casts genuine doubt upon
the Bank's stated reason for terminating her"); see also
Trujillo v. PacifiCorp, 524 F.3d 1149, 1156 (10th Cir. 2008)
(utilizing a totality of the circumstances approach in analyzing
an ADA associational discrimination claim).

For evidence of discrimination, Plaintiff primarily cites
(1) her disparate treatment in the way she was allowed to take
leave and (2) her forced resignation because of allegedly
improper assumptions about her need for future absences. The
court finds Plaintiff has plausibly alleged discriminatory

intent, but for a broader reason than those argued by Plaintiff.[9]

Plaintiff has alleged the following facts. First, Plaintiff was performing her job well in October and November of 2016. (Compl. (Doc. 5) ¶ 7.) Second, Defendant's only alleged displeasure with Plaintiff involved her time off to care for her disabled son in late 2016/early 2017. (See id. ¶¶ 13–15, 30.) After December 2016, Defendant allegedly began to treat Plaintiff differently. (See id.) Third, after those incidents involving her disabled son, Plaintiff was again performing her

_____

[9] Plaintiff alleges that she was "treated differently than similarly situated employees in that other employees not associated with a disabled family member were regularly permitted to take sick leave in less-than-half-day increments on temporary bases." (Compl. (Doc. 5) ¶ 30.) There are two problems with this allegation. First, as Plaintiff herself alleges, Principal Gould did in fact allow her to take time off in less than half-day increments from November 29 to December 5, 2016. (Id. ¶ 11.) Counting weekdays on the calendar, that means Plaintiff was allowed to take leave in less than half-day increments five times. Though Plaintiff alleges she was not allowed to continue leaving work at 2:30 p.m. after December 5, 2016, (id. ¶ 13), she was permitted to do so five times. Second, Plaintiff's only allegation about disparate impact is that "other employees" were "regularly" allowed to take leave in less than half-day-increments. (Id. ¶ 30.) So was Plaintiff, from November 29 until December 5, 2016. (Id. ¶ 11.) Plaintiff does not allege that these other employees were allowed to do so more "regularly" than she was, nor does she allege that these other employees had to take leave in week-long stretches, as she requested. In short, Plaintiff has not plausibly alleged that she actually suffered any disparate treatment at all beyond the conclusory assertion that she was treated differently, a conclusion that is not supported by the facts alleged.

job commendably. (Id. ¶¶ 21-22 (noting, among other laudatory remarks, that Plaintiff had "very capably taught . . . ."). Fourth, Plaintiff was compelled to resign at the end of the school year in May 2017. (Id. ¶ 23.) When combined, they give rise to a reasonable inference of discriminatory intent, that is, that Plaintiff was terminated "because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Plaintiff's facts plausibly support the inference that her association with her son was "more likely than not," Ennis, 53 F.3d at 58, the motivating factor for Defendant's actions. At a later stage, this inference may be rebutted by additional facts, but at this point, the inference must be drawn in Plaintiff's favor.

The inference stands despite the fact that there was a six-month gap between December 2016, when Defendant first had notice of Plaintiff's association with her disabled son and she took

her last absence, and her alleged termination in May 2017.[10]

Proving causation by temporal proximity alone generally arises only when the time period must be relatively short. See Strate, 398 F.3d at 1019–20; see also Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) (per curiam); King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding that two-and-a-half months too long a lapse in time, barring other circumstances that explain the gap); Williams v. Cerberonics, Inc., 871 F.2d

---

[10] This period of time also makes it more difficult to infer that Defendant was worried about Plaintiff missing more work to care for her son. Plaintiff relies on a case that illustrates this point, one in which an employee had to care for his disabled father. See Kouromihelakis v. Hartford Fire Ins. Co., 48 F. Supp. 3d 175, 180–81 (D. Conn. 2014). In Kouromihelakis, the employee was terminated following absences and tardiness that occurred up to the moment of termination. Id.; see also Kelleher, 939 F.3d at 468, 470 (reversing district court's decision to dismiss associational claim when employee terminated immediately after he was tardy due to the care requirements of his disabled daughter).

Here, other than the December 6, 2016 incident, all of Plaintiff's time off was approved. (Compl. (Doc. 5) ¶¶ 14–16.) Further, Plaintiff did not request any more time off after December 2016. (Id. ¶ 16.) The roughly six-month gap between her last requested absence to care for her son and her termination makes it more difficult to infer that, in May 2017, Defendant had any concern about her future availability for work.

Still, when viewing the totality of the complaint, including the ongoing nature of the illness of Plaintiff's son, the court finds there is a minimal inference of discriminatory intent.

452, 454, 457 (4th Cir. 1989) (finding three-and-a-half months too long a period).[11]

In the ADA associational discrimination context, the Seventh Circuit found, when reviewing a summary judgment decision, that a period of five months between an employee's last interaction with his employer regarding a disabled dependent and that employee's termination did not refute causation. <u>Dewitt</u>, 517 F.3d at 948. Another court allowed a claim to survive a motion to dismiss when a period of roughly eight months passed between the beginning of an employee's association with a disabled person and his termination. <u>Murray v. Neff Rental, Inc.</u>, Civil Action No. 08-0471, 2009 WL 3172831, at *6 (W.D. La. Sept. 29, 2009). In <u>Murray</u>, one of the disabled persons with whom the employee associated suffered from an illness that was incurable and would continue to require attention. <u>Id.</u> at *1.

Also, as has been frequently noted in the Title VII retaliation context, a period of time that is otherwise long may

---

[11] As noted throughout this opinion, Title VII and the ADA are sufficiently analogous that courts regularly utilize the reasoning from both bodies of case law interchangeably. <u>See, e.g.</u>, <u>Fox v. Gen. Motors Corp.</u>, 247 F.3d 169, 176 (4th Cir. 2001) ("Because the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose — the prohibition of illegal discrimination in employment — courts have routinely used Title VII precedent in ADA cases.").

not negate causation if the adverse action came at the first opportunity to retaliate. See Martin v. Mecklenburg Cty., 151 F. App'x 275, 280 (4th Cir. 2005) (noting that, in the retaliation context, an eleven-month period was explained by employer acting at first chance to retaliate); Hinton v. Virginia Union Univ., 185 F. Supp. 3d 807, 839 (E.D. Va. 2016); see also Summa v. Hofstra Univ., 708 F.3d 115, 128 (2d Cir. 2013) (finding that four-month gap was explained by first opportunity to retaliate).

Furthermore, if a period of time between notice about an association with a disabled person and a discriminatory act is filled with other acts evincing discriminatory animus, then causation can still be established. See Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007) (noting that "courts may look to the intervening period for other evidence of retaliatory animus" when there is an otherwise lengthy interval of time). In one associational discrimination case, the complaint alleged an employer continued to harass an employee about his supposed absences and tardiness to care for both himself and a disabled wife, a fact that bridged several months between the employee's last absence and his termination. Pollere v. USIG Pa., Inc., 136 F. Supp. 3d 680, 686 (E.D. Pa. 2015). Another plaintiff alleged his employer made explicit statements about how his disabled daughter was driving up healthcare costs for the whole company,

facts that bridged a temporal gap of almost eleven months. <u>Adams</u> <u>v. Persona, Inc.</u>, 124 F. Supp. 3d 973, 985 n.4 (D.S.D. 2015).

Here, the gap between when Plaintiff stopped taking leave to care for her son and when she was constructively discharged is not fatal at this stage. First, Plaintiff, as in <u>Murray</u>, was associated with a family member who had a persistent condition that would require more care, and Defendant was aware of the chronic nature of Plaintiff's son's disease. (Compl. (Doc. 5) ¶¶ 9, 15.) These facts support an inference that Defendant knew Plaintiff's association was ongoing. Second, Plaintiff was a teacher who was forced to resign at the end of the school year. (<u>Id.</u> ¶ 23.) Drawing all inferences in favor of Plaintiff, the review and timing are sufficient to establish a causal connection between association and termination at this stage of the proceedings.

Third, and most importantly, Plaintiff has also alleged intervening conduct that, when taken as true, provides evidence of discriminatory intent in the intervening period. <u>See</u> <u>Lettieri</u>, 478 F.3d at 650. "Throughout January and February 2017, Principal Gould began a course of retaliation against Plaintiff." (Compl. (Doc. 5) ¶ 17.) Those actions included holding Plaintiff to a higher standard than other teachers, reprimanding her for allegedly routine matters, and placing her

on a PIP that started in mid-March. (Id. ¶¶ 18, 20.) These facts provide sufficient evidence of discriminatory intent during the intervening period between the time Defendant became aware of Plaintiff's association and her forced resignation to support an inference of causation at this stage.

Finally, Defendant argues that Plaintiff's discrimination claim is based on her request for an accommodation, an accommodation she was not entitled to receive. (Def.'s Br. (Doc. 9) at 21.) Though Defendant is correct in that no accommodation need be given to the associate of a disabled person, Defendant is not correct insofar as the denial of such a request cannot serve as evidence of an impermissible motive. As stated by the Second Circuit in Kelleher, "[t]hough the ADA does not require an employer to provide a reasonable accommodation to the nondisabled associate of a disabled person, an employer's reaction to such a request for accommodation can support an inference that a subsequent adverse employment action was motivated by associational discrimination." Kelleher, 939 F.3d at 469. Plaintiff's allegations regarding Defendant's behavior in January through February of 2017, contribute to the facts that support the minimal inference needed at this stage.

**4. Plaintiff has Plausibly Alleged Her Claim of Associational Discrimination**

Plaintiff has alleged facts that plausibly suggest she was a teacher whose only issue with Defendant involved her efforts to care for her disabled son, issues that allegedly led to sudden negative attention and employment action from Defendant. She has plausibly alleged that she corrected those alleged deficiencies and was recognized as a commendable teacher who was terminated under coercive conditions. For those reasons, Plaintiff has plausibly alleged her associational discrimination claim. Defendant's motion to dismiss will be denied as to Count One.

**B. Count Two: ADA Retaliation**

Plaintiff's second claim is for retaliation under the ADA. (Compl. (Doc. 5) ¶¶ 32–37.) Plaintiff alleges she engaged in protected activity because she "reasonably believed that the ADA protected her both from (a) requesting reasonable accommodations to care for her disabled son [and] (b) complaining that her supervisor was retaliating against her for making requests for accommodations to care for her disabled son." (Id. ¶¶ 33–34.) Defendant raises several arguments against Plaintiff's retaliation claim, one of which is that it was in fact not reasonable for Plaintiff to think she was engaged in protected

activity. (Def.'s Br. (Doc. 9) at 26-27.) The court agrees with Defendant and will only address the reasonableness of Plaintiff's belief about her activity.

"No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Plaintiffs claiming retaliation under the ADA must make out a prima facie case that includes the following elements: "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." <u>Reynolds</u>, 701 F.3d at 154.

As to the first element, a plaintiff need not prove that "the conduct he opposed was actually an ADA violation. Rather, [s]he must show [s]he had a 'good faith belief' the conduct

violated the ADA." Id.[12] This good faith belief must be objectively reasonable, that is, a plaintiff "must allege the predicate for a reasonable, good faith belief that the behavior she is opposing violates the ADA." Freilich, 313 F.3d at 216.

If it has been widely declared that the ADA does not prohibit the behavior a plaintiff is opposing, then that fact significantly undermines a plaintiff's assertion that they were acting on a reasonable belief. See Tyson v. Access Servs., 158 F. Supp. 3d 309, 316 (E.D. Pa. 2016) (citing Freilich, 313 F.3d at 216–17); see also Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1388 n.2 (11th Cir. 1998) (noting, in the Title VII retaliation context, that "[i]f the plaintiffs are free to disclaim knowledge of the substantive law, the reasonableness

---

[12] A reasonable and good faith belief is only required for "opposition activity." See Felix v. Sun Microsystems, Inc., No. Civ. JFM-03-1304, 2004 WL 911303, at *18 (D. Md. Apr. 12, 2004) (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998)). "Participation" activity, on the other hand, requires no such showing. Id. Participation activity includes only those actions taken within statutorily established systems, such as filing an EEOC charge. See id. Since Plaintiff's EEOC charge came well after her termination, her activities are properly analyzed as "oppositional." "Opposition activity encompasses the use of informal grievance procedures as well as the staging of informal protests and voicing of one's opinions in order to bring attention to an employer's discriminatory behavior." Id. (citing Laughlin, 149 F.3d at 259.) In the absence of any allegation of participation activity, this court construes Plaintiff's allegations pursuant to an oppositional activity theory.

inquiry becomes no more than speculation regarding their subjective knowledge"). Also, if a plaintiff's alleged basis for invoking the ADA is intrinsically unreasonable, then that fact also undermines a claim that they were opposing behavior they reasonably believed violated the ADA. See Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1097 (7th Cir. 1998) (discussing case where it was not reasonable for a manager to believe he was protecting another employee he believed to be disabled when objective facts showed employee was not, in fact, disabled within the meaning of the ADA); Heyne v. HGI-Lakeside, Inc., 589 F. Supp. 2d 1119, 1127 (S.D. Iowa 2008) (finding that a plaintiff's belief he was disabled, and thus entitled to an accommodation, was not reasonable as a matter of law since plaintiff performed strenuous physical tasks despite his claimed disability).

In the present case, Plaintiff alleges it was reasonable for her to think the ADA (1) allowed her to request accommodations to care for her son and (2) to report any retaliation based on those requests. (Compl. (Doc. 5) ¶ 33.) Only the second allegation can qualify under Section 12203(a) as "oppos[ing] any act or practice made unlawful by [the ADA]." The court construes the two allegations together as a claim that it was reasonable for Plaintiff to oppose retaliation for

requesting an accommodation, because it was reasonable to believe her requested accommodations were permitted by the ADA. Plaintiff, however, is mistaken about the reasonableness of her beliefs regarding requests for accommodations and does not allege a reasonable predicate for her beliefs.

The statute, administrative guidance, case law, and even the EEOC's own website all declare that the ADA does not require an employer to make any accommodations to those associated with disabled persons. 42 U.S.C. § 12112(b)(5); 29 C.F.R. § 1630.8, App. ("It should be noted, however, that an employer need not provide the applicant or employee without a disability with a reasonable accommodation because that duty only applies to qualified applicants or employees with disabilities."); Tyndall, 31 F.3d at 214 ("The ADA does not require an employer to restructure an employee's work schedule to enable the employee to care for a relative with a disability."); Questions and Answers About the Association Provision of the Americans with Disabilities Act, U.S. E.E.O.C., https://www.eeoc.gov/facts/association_ada.html (last visited Oct. 4, 2019) ("Does the ADA require an employer to provide a

reasonable accommodation to a person without a disability due to that person's association with someone with a disability? No."). Plaintiff's beliefs about her right to an accommodation in the first place are contrary to clearly established law and policy.[13]

Further, Plaintiff's basis for her first complaint to HR, her communications with Principal Gould about her need to leave school early, could not have led to a reasonable belief that she was opposing conduct prohibited by the ADA. Plaintiff never complained about discrimination based on her association with her son, only about Principal Gould's reluctance or refusal to

---

[13] It is true that retaliation victims should not be forced to view the law with the "trained analytical eyes of lawyers." Ferrell v. Harris Ventures, Inc., 812 F. Supp. 2d 741, 746 (E.D. Va. 2011) (addressing a Title VII retaliation claim). However, the regulations, cases, and the plain language of the EEOC publications, clearly state the rule here that employers need not provide accommodations to associates of disabled persons. See, e.g., U.S. E.E.O.C., supra, at 40.

grant her an accommodation.[14] After Principal Gould did not

respond to Plaintiff's request to leave work early on December

6, (Compl. (Doc. 5) ¶ 14), Plaintiff assumed it was fine for her

to leave before the school day was over, as she had done the

previous week, (id. ¶¶ 11, 14). After Plaintiff left on

December 6, however, Principal Gould emailed her later that

night "inquiring where she had been, and stating that he had not

seen her at bus duty at 2:30 pm that afternoon." (Id. ¶ 14.)

"Plaintiff replied that she had explained her situation with her

son and thought it was okay to leave at 2:30 pm. When she

received no response back, she became very concerned." (Id.)

---

[14] To the extent that Plaintiff complained to HR that she
was "bullied," (Compl. (Doc. 5) ¶¶ 15, 19), that bullying was
apparently the retaliation for requesting an accommodation.
Plaintiff's allegations in paragraphs 15 and 19 could be
interpreted as complaining not about retaliation, but
discrimination (bullying), something that is prohibited under
the ADA and could serve as protected activity.
     That interpretation of those paragraphs, however, is not
plausible in light of Plaintiff's own assertions. As noted
above, Plaintiff alleges her retaliation claim is proper because
she believed the ADA protected her from "complaining that her
supervisor was retaliating against her for making requests for
accommodations to care for her disabled son." (Compl. (Doc. 5)
¶ 33.) Plaintiff also alleges that the retaliatory animus behind
the adverse employment actions was evidenced by the denial of
her request for an exception to the leave policy as well as
negative animus shown to "her disability-related requests." (Id.
¶ 36.) This allegation further links her alleged protected
activities to requests for accommodations to care for her son.
Since Plaintiff herself limits her claim to retaliation for
requesting accommodations, this court construes the complaint in
that fashion.

Plaintiff also informed Principal Gould she would not be at work the following day, December 7. (Id.) Principal Gould apparently did not respond again that night. The next day, Plaintiff complained to HR that Principal Gould was "bullying her and retaliating against her for caring for her disabled son." (Id. ¶ 15.)

Based on the facts alleged, Plaintiff could not have reasonably believed that Principal Gould's conduct in December 2016 amounted to retaliation under the ADA. In fact, Principal Gould did not deny her leave request, but expressed confusion about where Plaintiff had been. Further, Plaintiff informed Principal Gould that she would not be at work the next day, December 7; Plaintiff does not allege that Principal Gould denied that request or immediately responded in a negative manner, only that he did not respond. As in Talanda and Heyne, the basis for Plaintiff's complaint to HR was intrinsically unreasonable in that Principal Gould did nothing that would lead to a reasonable belief that he had violated the ADA. Though Plaintiff's second complaint to HR allegedly followed a series of negative actions by Principal Gould that could be seen as retaliatory, that complaint was still based on an unreasonable belief about her right to request an accommodation.

Because the law was uniformly opposed to Plaintiff's beliefs about her right to seek an accommodation, and her own allegations do not plausibly support a reasonable belief that Principal Gould was violating the ADA, the court finds that Plaintiff has not plausibly alleged or shown a reasonable belief that the conduct she was opposing violated the ADA. Plaintiff's allegations, therefore, do not plausibly support the conclusion that she engaged in protected conduct. For that reason, her retaliation claim will be dismissed.

### C. Count Three: North Carolina Public Policy

Plaintiff's final claim is that she was terminated in violation of North Carolina's public policy as stated in N.C. Gen. Stat. § 143-422.2, as well as Sections 95-28.1A, and 115C-302.1, and 16 N.C. Admin. Code § 6C.0402. Plaintiff argues that this issue is one of "complex state law" that should not be determined at this juncture. (Pl.'s Am. Resp. (Doc. 14) at 22.) Defendant disagrees, arguing that a constructive discharge cannot serve as the basis for such a claim. (Def.'s Br. (Doc. 9) at 30.) The court agrees with Defendant.

"It is the public policy of [North Carolina] to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of . . . handicap by employers which regularly employ

15 or more employees." N.C. Gen. Stat. § 143-422.2 (2019).

Notwithstanding that policy statement, North Carolina is an

employment-at-will state, and an employee may be discharged "for

no reason, or for any arbitrary or irrational reason." Coman v.

Thomas Mfg. Co., 325 N.C. 172, 175, 381 S.E.2d 445, 447 (1989)

(quoting Sides v. Duke Univ., 74 N.C. App. 331, 342, 328 S.E.2d

818, 826 (1985)).

North Carolina does have a narrow exception to the at-will

doctrine that permits a cause of action when an employee is

terminated for an unlawful purpose that "contravenes public

policy." Id. Despite Plaintiff's arguments to the contrary,

North Carolina courts and federal courts applying North Carolina

law have repeatedly found that "no private cause of action

exists for retaliation, hostile work environment, disparate

treatment, or constructive discharge in violation of public

policy." Jones v. Duke Energy Corp., 43 F. App'x 599, 600 (4th

Cir. 2002) (emphasis added). In rebuttal, Plaintiff argues that

the phrase "constructive discharge" can encompass different

scenarios and may not include a scenario resembling her

situation. (Pl.'s Am. Resp. (Doc. 14) at 23.) The North Carolina

Court of Appeals, in a persuasive unpublished opinion, held

contrary to Plaintiff's position. In Clark v. United Emergency

Services, Inc., the North Carolina Court of Appeals analyzed a

constructive discharge very similar to Plaintiff's. 189 N.C.

App. 787, 661 S.E.2d 55, 2008 WL 1723229, at *3 (Apr. 15, 2008).

In that case, the plaintiff "met with her supervisor and was

asked to write and execute an official statement of resignation.

She refused to do so and understood she was terminated when she

was told to accept on-call duties or find a new career." Id.

(internal quotation marks omitted). Because the plaintiff in

that case was not able to work an on-call shift due to a medical

condition, id. at *7, she alleged she was constructively

discharged, a contention with which the court agreed. Id. at *4.

Still, the court observed:

> In [cases after Coman[15]], our appellate courts declined
> to recognize a public policy exception to the at-will
> employment doctrine for constructive discharges.
> Graham v. Hardee's Food Systems, Inc., 121 N.C. App.
> 382, 385, 465 S.E.2d 558, 560 (1996) ("North Carolina
> courts have yet to adopt the employment tort of
> constructive discharge."); Beck v. City of Durham, 154
> N.C. App. 221, 231, 573 S.E.2d 183 (2002) (affirming
> dismissal of plaintiff's claim for constructive
> discharge); . . . Whitt v. Harris Teeter, 165 N.C.
> App. 32, 598 S.E.2d 151 (2004), rev'd and dissent
> adopted by 359 N.C. 625, 614 S.E.2d 531 (2005) (North
> Carolina courts have yet to adopt a hostile work
> environment constructive discharge claim); see also

---

[15] Coman appears to endorse the possibility that some form
of a constructive discharge could serve as the basis for a
termination in violation of public policy claim. Coman, 325 N.C.
at 173-74, 381 S.E.2d at 446. As ably stated by the Clark court,
however, after Coman, "appellate courts declined to recognize a
public policy exception to the at-will employment doctrine for
constructive discharges." Clark, 189 N.C. App. 787, 661 S.E.2d
55, 2008 WL 1723229, at *4.

> Mosley v. Bojangles' Restaurants, Inc., No.
> 1:03CV00050, 2004 WL 727033, at *11 (M.D.N.C. Mar. 30,
> 2004) ("North Carolina courts have declined to
> recognize a public-policy exception to the employment-
> at-will doctrine for constructive, as opposed to
> actual, discharges.").

Id. An actual discharge is still a necessary predicate "to state

a claim for relief for wrongful discharge in violation of the

public policy of North Carolina. . . . [U]ntil North Carolina

courts expressly recognize constructive discharges for claims of

wrongful discharge . . . , [U.S. district courts] will also

refuse to do so." Riepe v. Sarstedt, Inc., Civil No. 5:09-CV-

00104, 2010 WL 3326691, at *5-6 (W.D.N.C. Aug. 23, 2010).

In light of the forgoing analysis, this court declines to

expand North Carolina public policy to allow a constructive

discharge to support a wrongful termination claim. Plaintiff has

provided this court with no North Carolina decision that

contradicts the holding of the Clark court. A federal court

applying state law should not expand state public policy. Time

Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec.

Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007).

For these reasons, Plaintiff's third claim for wrongful

termination in violation of North Carolina public policy will be

dismissed.

## IV.  CONCLUSION

For the foregoing reasons, this court finds that Defendant's motion to dismiss should be denied in part and granted in part.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss, (Doc. 8), is **DENIED IN PART AND GRANTED IN PART.** Defendant's Motion to Dismiss is **GRANTED** as to Counts Two (ADA Retaliation) and Three (North Carolina Public Policy); the motion is **DENIED** as to Count One (ADA Associational Discrimination).

This the 26th day of February, 2020.

_____
United States District Judge