UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
NO. 1:18-CV-910

THERESA SCHMITZ, )
)
Plaintiff, )
)
v. )
)
ALAMANCE-BURLINGTON BOARD )
OF EDUCATION, )
)
Defendant. )
____________________________)

ZOOM VIDEOCONFERENCE DEPOSITION OF THERESA SCHMITZ

(Taken by Defendant)

Greensboro, North Carolina

Wednesday, September 16, 2020

Reported in Stenotype by
Diane Pressley, Shorthand Reporter
Transcript produced by computer-aided transcription

APPEARANCES

ON BEHALF OF PLAINTIFF:

JONATHAN WALL, Esquire
Higgins Benjamin, PLLC
301 N. Elm Street, Suite 800
Greensboro, North Carolina 27401
(336)275-7577
(Via videoconference)

ON BEHALF OF DEFENDANT:

DAVID NOLAND, Esquire
Tharrington Smith, LLP
150 Fayetteville Street, Suite 1800
Raleigh, North Carolina 27602
(919)821-4711
(Via videoconference)

ZOOM VIDEOCONFERENCE DEPOSITION OF THERESA SCHMITZ, a witness called on behalf of Plaintiff, before Diane Pressley, Notary Public, in and for the State of North Carolina, located in Wake County, the deponent's stated physical location being at Higgins Benjamin, PLLC, 301 N. Elm Street, Suite 800, Greensboro, North Carolina, held on Wednesday, September 16, 2020, commencing at 10:04 a.m.

Q. How long have you been coaching?
A. That was after my first year, so for the last two years.
Q. Do you also have classroom teacher responsibilities in that role?
A. I do not.
Q. And you said you do work directly with students as well as working with teachers?
A. Yes.
Q. Can you just walk me a little bit through your employment history? What was your first role teaching?
A. Actually I started off in special ed classroom about 22 years ago. I wasn't special ed certified but they had enough confidence in me to lead that classroom until they had a regular ed classroom position available. That was about 22 years ago.
Q. My -- that was going to be my next question, is where was that?
A. I'm from Ohio, so that was in Ohio when I first started my career, and I taught in some districts in Ohio and moved here to North Carolina and I've been teaching here for the last eight years.
Q. So in 2012 you moved to North Carolina?
A. Yes, sir.
Q. What teaching roles in North Carolina have you

held?

A. I worked for Wake County. I was a fourth grade teacher within the district.

Q. For how long?

A. That's been -- I believe that was three years, four years, maybe.

Q. Okay. And was that prior to coming to Alamance?

A. Yes, it was.

Q. Was there any gap in time?

A. There was a point where I moved back to Ohio for a year during these eight years that I've been in North Carolina. I did move back, I took a position back home. And so I left for a year and then I -- when I came back is when I was employed with Alamance.

Q. Okay. So it's always dangerous when I try to do math but I'm going to try to work through the dates.

So around 2012 you moved to North Carolina, you worked for Wake for three or four years, so then around 2015 -- the 2015 to '16 school year is when you went back to Ohio?

A. Yes, sir, around then.

Q. And then the '16-'17 school year is when you started in Alamance. Is that right?

A. Yes. Yes.

Q. And you were just there for the one year

Q. Cayden. I apologize.
A. Uh-huh.
Q. When did that begin?
A. Can you clarify that question? Like, when did what begin? Like medical issues or --
Q. Yes, his medical issues.
A. Back in probably I want to say of 2016. It would be early in the year. It started with his pediatrician, I had some concerns in which his pediatrician referred us to a neurologist and then it went from there.
Q. And what took place in the fall of 2016 at -- he had surgery, is that accurate?
A. Yes, he had emergency brain surgery due to a brain tumor.
Q. When was that surgery?
A. That was in November of 2016. It was the day before Thanksgiving. Two days before Thanksgiving, I believe.
Q. Okay. How is he doing now?
A. He's healing.
Q. Good. I'm glad to hear that.
A. Thank you.
Q. So stepping back to the beginning. You said you interviewed with Mr. Gould in October and you were hired that same day?

So the -- what was the first week that you left at 2:30?

A. Okay. So that would have been the week after Thanksgiving, so maybe the -- or the week after the -- the Monday after I had called Mark after my son -- this was after the initial surgery, I asked and requested that I leave at 2:30 and he said that was fine.

And then the following week now this would have been the second week after that Thanksgiving of 2016.

MR. WALL: I'm handing her a blank calendar.

THE WITNESS: Thank you because these dates are --

MR. NOLAND: Thank you. No, that's a good idea. Thank you. I appreciate that.

A. Okay. So let's back up just a little bit. My son's surgery was on, I want to say the 22nd of November, and then I returned to work on November 28th.

I'm sorry. November 28th he had his stitches removed and then I returned on the 29th.

BY MR. NOLAND:

Q. And without seeing that calendar, that's the Tuesday?

A. Yes, it's a Tuesday. That week I had requested that I -- if I could leave early at 2:30 after my instructional time and Mark granted that time for me to

go home and be with my son.

Q. How did you make that request?

A. I called him on the phone.

Q. On the 29th?

A. I believe it was the 28th. I returned to work on the 29th. So I -- it would have been the 28th.

Q. And do you recall what was said in that conversation?

A. Yeah, I -- I had just seen his doctor, he had just gotten the stitches removed and I told him that the doctor had not cleared him for school, that he would not be ready to go back to doing anything normal for at least a month. And so in order for -- you know, with that news and, you know, with, you know, my husband and I, you know, trying to split this load between trying to take care of him I had asked him if I could have that week to be with him.

Q. And so you asked him for that week to leave at 2:30?

A. Yes, sir.

Q. And he said okay?

A. You know, I may have -- I may have -- yes, that was the first week, I'm sorry. So the first week the 28th, was right after his surgery, so yes.

Q. All right.

to your recollection, did you speak with him on the phone about your request earlier than this e-mail at 9:39 p.m.?

A. Yes, I did. I believe I did speak with him before then.

Q. Do you recall what took place in that conversation?

A. I think that was when I had left a voicemail for him on his cell phone.

Q. Okay. So you -- your recollection is that prior to sending this e-mail at 9:39 you had left him a voicemail?

A. Yes, I believe.

Q. And you don't -- you didn't reference the voicemail in the e-mail?

A. I guess I didn't. Not on this document, no.

Q. And so the best of your recollection, did you hear back from Mr. Gould the evening of December 5th?

A. No, I did not.

Q. Okay. Am I right that you were out of school on December 5th?

A. I was out of school on December 5th, correct.

Q. And that's -- is that the day that your son had his stitches out?

A. Yes, it was.

A. Right. This was after the school period, correct.

Q. And now, if we go back to Exhibit 2 for a moment. If we look at the middle e-mail on the page, and this is from Mr. Gould at 1:31 on December 6th. And he says in the third sentence, "I'm unsure that things are getting done so I'm hesitant to allow you to leave directly after school."

Do you see that e-mail?

A. Yes, I do.

Q. That was before the end of the school day?

A. Right. And it could have been something I didn't see until after I left because I was probably teaching or busy teaching doing something, but, yeah.

Q. And if you look up at your response later that evening I think that's exactly what you say?

A. Oh, yeah. "I am seeing" -- yeah, exactly, "I am just seeing this e-mail." Yep.

Q. Okay. So before the end of the day on the 6th he did respond to you and tell you that you weren't allowed to leave right after school, you just hadn't --

A. Well, he said I'm hesitant to allow you. He doesn't say yes or no.

Q. Okay. That's accurate. He says I'm hesitant to allow you. You just hadn't seen that e-mail before the

BY MR. NOLAND:

Q. Why did you decide to stay home the next day?

A. Because like I've already stated, I felt that I had exhausted my talks with Mark Gould and I had tried to talk to him about the situation with my son and his disabilities and I wasn't getting anywhere, so my next step would be to HR.

Q. Right. My question is why did you decide to stay home from work the following day?

A. So that I could contact --

MR. WALL: Form.

A. So that I could contact HR, which I did first thing the next morning at 9 a.m.

BY MR. NOLAND:

Q. So you -- okay.

And looking at this exhibit and your response this is the 6:57 p.m. e-mail where you say that you will stay home tomorrow and call HR. The next two paragraphs go on to talk about two different items of work. Is that right?

A. I'm looking for it. Just one second.

Q. Sure.

A. 6:37, is that what you said? Oh, 6:57.

MR. NOLAND: It's 6:57.

A. I'm sorry. What was your question?

decision. And I say that in the next e-mail. HR said they would get back to me, they were running this by.

Q. Yes. And in that next e-mail, the -- your response at 10:51, you say you need to know if accommodations can be made for your son. Is that right?

A. Uh-huh.

Q. And that accommodation would be leaving at 2:30?

A. Yes.

Q. So you were waiting to hear back from HR about whether that would be -- that leaving at 2:30 would be accommodated?

A. I wouldn't say accommodated, but I would say if there was something that we -- that could be done. I mean, if my pay could have been prorated, you know, for that last 45 minutes of the day because those were the things that I had talked about in my phone conversation with HR at 9:00 that morning.

Q. Who did you speak with at HR?

A. I don't recall her name. She was the -- I would assume maybe a secretary type person to Dawn Madren.

Q. Who was Dawn Madren at the time?

A. Dawn Madren is the head of HR for Alamance.

Q. And just so we're clear on the record with it, in your email response where you say they were running this by the executive director, is that referring to Dawn?

A. Yes.

Q. Okay. What do you recall about the phone conversation in the morning on December 7th?

A. It was horrible, that's what I recall. I was very upset about the events and, and my dealings with Mark and him not understanding like the urgency of the situation. You know, my son just had major brain surgery, he couldn't walk, he couldn't talk, he couldn't care for himself, he needed somebody to be with him, you know, to help him.

So I expressed all of the -- all of those things to the person that I talked to on the phone from Alamance, and I explained to them that I felt that Mr. -- Mr. Gould was retaliating against me or treating me badly, I believe I said both of those things because I was dealing with this. He wouldn't respond to my e-mails, he wouldn't respond to my phone calls and I needed to -- I needed to talk with somebody about what can be done. You know, if that meant, you know, having my pay prorated, you know, for the last 45 minutes of the day just so I can leave at 2:30. I explained the situation about my husband, you know, his job is helping him, you know, deal with this and this is what he could do and this is what -- if I can do this then we have it -- you know, we have a plan in place, you know, to

care for him. To care for my son during this time which was a very hard time for all of us.

So I was just in tears. I was in tears, and very upset that this was happening at all, because I -- you know, I -- my -- you know, I love teaching, I love my students at Sylvan. I loved my students at Sylvan. I liked, you know, going there everyday and this was just heartbreaking for me that we couldn't come to a -- to a conclusion about this and I had to take it to the next level, to HR.

Q. To the -- I'm sorry.

A. I didn't say anything. That was my watch that beeped. I'm sorry.

Q. Did the HR representative you spoke to say anything to you?

A. She kind of did. She said, "Well, that makes sense, you know, let's see. I can -- I can let Dawn know."

And that was specific to the request of maybe having my pay docked, you know. I think we talked about, you know, getting a sub. I said well they will have to pay a sub, you know, for the half a day whereas they would only have to dock my pay for the last 45 minutes, you know. And whoever I talked to said, "Yes, that makes sense, you know, and I will let Dawn know. I

will run it by Dawn."

And so we hung up and I just waited. And in the meantime I was getting these e-mails from Mark.

Q. Did you end up talking with Dawn that day?

A. Yes, I did. And that's when she told me that I -- if I were to take any more days I would have to take half days and that my pay would be cut in half. And I inquired well, what about just -- you know, I asked again about, you know, having my pay prorated or, you know, taking off for those last 45 minutes and she didn't give me a response.

Q. And when was that conversation?

A. That was December 7th.

Q. Was it in the afternoon?

A. Yes, it was. It was later in the afternoon, if I recall.

Q. And was anyone else on the call or was it just you and Dawn?

A. It was just me and Dawn.

Q. And you were told that you could continue to leave early but would need to take half day leave?

A. Correct. And that -- then that would mean that I would have to leave at 11, which -- which, you know, was not really even okay with me because I still -- I cared about my students and I wanted to be there all day for

anyone anywhere in Alamance-Burlington school system?
A. I have no idea.
MR. WALL: Object to form.
Are we talking about having it prorated or just a salary worker taking a half hour off or something?
BY MR. NOLAND:
Q. Having the pay prorated.
A. I have no idea.
Q. So following your conversation with Dawn, I believe you said you did start taking half days at that --
A. Yes.
Q. -- point?
A. Yes.
Q. And that lasted until the holiday break?
A. Yes.
Q. Which was -- and you can refer to the calendar you have if you need it, but it was about two weeks, or a week and a half. Is that right?
A. I believe it was nine days total.
Q. So for those nine days you would leave at 11?
A. Yes.
Q. And you had a sub for the afternoons on those days?

January 3rd, one of those days.

Q. Did you speak with Mr. Gould about the request to have -- to left -- to leave early when you returned from winter break?

A. Nope, there was never a conversation for me to leave. It had been a month since my son's surgery and he was doing great, so there was no reason why I would have had to ask for time off.

Q. On your return to full days did your work schedule remain the same as it had been earlier in the year?

A. Yes.

Q. Did you have bus duty in the -- in that time period?

A. Yes, we did. That did continue to happen. Grade levels rotated.

Q. Talk a little bit about observations that were done. Am I right that you had two observations from Mr. Gould during the 2016-'17 school year?

A. Uh-huh. Yes.

Q. If we could hop to Exhibit 18.

(Exhibit 18 was marked for identification.)

BY MR. NOLAND:

Q. Take your time getting there. You see the cover e-mail is later on I think you had requested from Dawn

thing after another. If it wasn't one thing it was another that he had a problem with, and some of them didn't even relate to anything that -- that was in my PIP plan.

Q. And --

A. There were new concerns and it was just nonstop for Mark, nonstop.

Q. I believe that you've testified earlier you did not take steps to make changes in the matter in which you communicated with Mr. Gould. Is that right?

A. That's not what I said at all.

Q. Okay.

A. I said I continued to communicate with Mark the way that I communicated with him from the day I met him. That never changed. I communicated with him, you know, until, you know, he -- his demeanor, you know, at the beginning before the issues with my son they were pleasant. Afterwards, I -- there was nothing pleasant about him. There was nothing he wanted to hear from me, nothing he wanted -- nothing I could do right. It was one thing after another after another: His ignoring, his reprimands, his PIP plans, his -- his expectations that were -- that -- that -- of no other teachers had to do except for me, I felt. And I was being treated differently because I was dealing with issues with my

school submitted lesson plans for review by Mr. Gould?

A. I have no idea. No, I don't know that.

Q. Okay.

A. I felt like I was doing -- before the PIP plan I was doing the same thing as the other fourth grade teachers, but because of the situation with my son and me having to ask for -- and to involve HR, and all of these things, I was then treated differently. And that started in December.

Q. So you accurately predicted that I will move to asking about the resignation. Do you want to take a break before we move to that or are you good to go?

A. No, I'm good. I'm good.

Q. Okay. What is the -- there was a meeting on May 12th about the resignation. Is that correct?

A. I don't remember the exact date.

Q. Okay. Let's look at Exhibit 12.

(Exhibit 12 was marked for identification.)

A. I do remember that the resignation Dawn requested that it be turned in on Friday, so if we -- let me look at the calendar here. Yes, May 12th was a Friday, so the meeting happened on Monday, May, 8th.

BY MR. NOLAND:

Q. Okay. So the meeting was May 8th, that was the Monday. And then the form was turned in on the 12th.

Is that -- that's right?

A. Correct. That was because that's what Dawn said I needed to turn it in by the 12th, by the Friday.

Q. The meeting on May 8th, when -- when was the first you heard about that?

A. I was in my classroom teaching and an aide, I can't remember who it was, came to my classroom and said Mr. Gould needs you in his office.

This was unexpected. I -- I -- there was no meeting planned, nothing. I said, okay. "I'll cover your class." I said, okay. So I went down there and Dawn and Mark were waiting for me.

Q. And that -- on May 8th Dawn and Mark were in the office?

A. Yes.

Q. Okay. And was anyone else there for that meeting?

A. No.

Q. It was just the three of you?

A. Yes.

Q. And what happened in the meeting?

A. I walked into the office. I -- they were both sitting behind the desk. Well, Dawn was in front, Mark was at his desk. I sat down and from what I can recall Dawn said -- just one second.

-- "We've decided not to renew your contract for next year. You need to sign this recommendation" -- or -- not recommendation -- "resignation letter" -- and she proceeded to hand me a blank copy of Exhibit 12 -- "by Friday or you will be put on a list you don't want to be put on."

Q. Do you know what -- I'm sorry. Go ahead.

A. And then -- sorry. I'm recalling the meeting.

So I sat there just shocked. I didn't know what to say. I was embarrassed, I was hurt I was probably ready to burst into tears like I am now. I just thought here's another shocker, shocked again, you know. I had tried everything that, you know, that I could do to rectify the situation, and it just -- it wasn't stopping.

So out of -- I didn't cry, so which was good. I didn't cry. I was embarrassed. I didn't know what to say, so I just simply said okay. I always get a recommendation from my previous employers, which I have 20, at least 20 recommendation letters. I said, "Can I get a recommendation letter?" And Dawn said, "Yep, that's fine."

And then Mark, his demeanor at the meeting it was horrible. I could still remember his face. He was like skulling(phonetic) at me, like hatred, like, just, it

surgery. He has chemo, you know, I mean, this is huge. And I'm told that, yeah, if you don't sign it, you know, you're going to be put on this list. And I knew exactly what that list meant. That list meant that I would not be able to get a job within North Carolina in the school system, so how -- what -- what was I was supposed to do?

So at the meeting -- let's get back to that. I --

Q. Let me ask you --

A. I left.

Q. -- about the meeting, and if you want to take a moment that's fine, I understand.

I was going to say this was a stressful time for you but I think that probably under sells it.

A. It was very stressful, yes.

Q. Take a moment or as much time as you need.

A. Okay.

Q. I want to ask about the comment about the list. You said it was Dawn who said that?

A. Yes.

Q. Do you recall exactly what she said?

A. That's exactly what she said.

Q. That's what she said is sign this or you will be put on a list that you don't want to be on?

A. Yes. If you don't sign and turn it in by Friday

you will be put on a list. A list you do not want to be on.

Q. And you said a moment ago you knew what that list meant?

A. Yeah, I have a pretty good idea what that list meant.

Q. What was your understanding of the list she was referring to?

A. I would not be able to teach in another North Carolina school district because they would somehow -- it was a blacklist. There's -- you know, I'm sure they exist out there. You know, your name gets put on a list, nobody wants to hire you.

Q. And that was your understanding of the list that she was referring to?

A. Yes.

Q. Did you ask her about what list she was referring to?

A. I did not.

Q. And I believe you said at the time that you did not have much of an understanding of the process of renewal or nonrenewal of contracts. Is that accurate?

MR. WALL: Object to form.

A. I do. I mean, of course your -- your evaluations in this case they were NCEES, can decide if you're going

to be renewed or non-renewed, I'm sure.

Q. Do you know who makes the determination as to whether you are renewed or non-renewed?

A. I do not know.

Q. Do you know if it was Dawn Madren who gets to make that determination?

A. I do not know.

Q. Do you know if it's the superintendent?

A. I do not know.

MR. WALL: Object to form.

BY MR. NOLAND:

Q. And you didn't ask in that meeting about what the process would be for nonrenewal, is that right?

A. No, I did not. I was -- I was in shock that this had culminated to this and now they were threatening my livelihood, my career, my passion, something that I had been doing for 22 years.

Q. Did you look at school system board policies about teacher contracts?

A. No, I did not.

Q. So looking at Exhibit 12, you said in the meeting you were given a blank version of this?

A. Yes.

Q. Is this your handwriting on the document?

A. Yes, it is.

Q. Both, the print and the signature?
A. Yes.
Q. And so you filled this out in the course of the week between May 8th and May 12th?
A. Yes.
Q. And you indicated three places for, you know, reason for resigning, one of which is to teach in another North Carolina school district. Had you looked at positions in other school districts at that time?
MR. WALL: Object to form.
A. I don't believe at that point because that's a really busy time of the year, but I was assuming I have to work so I would be hopefully teaching at another NC district.
BY MR. NOLAND:
Q. The effective date is listed as June 15th, 2017. Did you select that date?
MR. WALL: Object to form.
A. Dawn made it clear that I had to resign by the end of the year so that was the last day of school, so that's the date I used.
BY MR. NOLAND:
Q. Okay. Do you know if you could have selected an earlier date?
A. Well, I was under the impression that they were

A. No, I'm referring to the students in my classroom. Maybe I was making a general statement. I don't -- I don't remember. But all kids.

Q. Exhibit 16.

(Exhibit 16 was marked for identification.)

BY MR. NOLAND:

Q. And it's just the one page.

A. Exhibit 16? I'm sorry.

Q. Yes.

A. Okay.

Q. I believe you said that in the May 8th meeting you asked about a reference letter and Dawn said yes, we could get you one?

A. Yep. Yes.

Q. Did you at some point ask Mr. Gould specifically for a reference letter?

A. Before May 8th?

Q. At any time did you -- did you ask him directly?

A. No, just at the May 8th meeting.

Q. Okay. And just based on looking at this e-mail on Exhibit 16, it's the e-mail you sent to Dawn, it says, "Mr. Gould is ignoring my e-mails again. I asked him for a reference letter, I cc'd you in the e-mail, and he replied that he would put one together for me."

So you -- following that -- is that following the

May 8th meeting you e-mailed Mr. Gould about it?
A. Yes, because it was what we talked about in the May 8th meeting.
Q. So you requested that he provide you with a reference letter. Is that right?
A. Yes, in the May 8th meeting.
Q. And subsequently by e-mail?
A. I'm sorry, can you repeat that?
Q. And also you followed up by e-mail to ask for the reference letter?
A. Because it was June 13th, I had two days left and I hadn't received it, and I really wanted it to -- to help me get another job.
Q. I understand. And ultimately you did get a reference letter from him. Correct?
A. I did.
Q. If you look at Exhibit 17.
(Exhibit 17 is marked for identification.)
BY MR. NOLAND:
Q. That is a copy of the -- is that a copy of the reference letter that he wrote?
A. It is.
Q. And I'm going to -- it's dated June 15th, 2017?
A. Yes.
Q. Is that -- do you recall is that the day you